SPECIALIZED TOURS, INC.,
Respondent,

v.

Ronald D. HAGEN, Appellant.

No. C1–83–135.

Supreme Court of Minnesota.

Aug. 8, 1986.

Lee L. Fossum, Northfield, for appellant.

John S. Gowan, Ronald L. Seeger, William J. Ryan, Rochester, for respondent.

KELLEY, Justice.

In 1979, appellant Ronald D. Hagen (Hagen) entered into a contract to sell Dittmann Travel Organization, Inc., d/b/a Dittmann Tours (Dittmann), to respondent Specialized Tours, Inc. Shortly after the sale, Specialized Tours ceased making contract payments. Subsequently, it sued Hagen, claiming breach of contract/warranty, fraud/misrepresentation, and violation of the Minnesota Securities Act (Minn.Stat. §§ 80A.01–.31). Hagen counterclaimed for the unpaid contract balance and alleged fraud and conversion.

Following a lengthy trial to the court, the judge found Hagen had breached various contract warranties, committed actionable fraud and violated the Minnesota Securities Act. The trial court also found Specialized Tours converted Hagen's security interest and breached various contract agreements. Based upon its findings, the trial court awarded Specialized Tours judgment against Hagen in the amount of $411,246.13. The trial court also awarded Hagen judgment against Specialized Tours in the amount of $442,308.80, representing the unpaid balance under the sale agreement.

Both parties appeal from the court's findings and judgment. We affirm in part, reverse in part and remand.

### 1. *Preliminary Facts.*

Ronald Hagen became involved in the travel business in 1959. From 1963 until July 3, 1979 he was the sole stockholder and manager of Dittmann. By the time of its sale, Dittmann was one of the nation's three largest public charter tour agencies, specializing in sales to college and university alumni organizations. Although the corporation was engaged primarily in the public charter business, it also sold retail airline tickets and accommodations. This retail operation accounted for approximately ten percent of Dittmann's gross revenue. Dittmann's annual gross revenue for the fiscal year preceding the sale exceeded $3 million, with gross income at $361,508. Projected gross revenue for the fiscal year 1980 was $5 million.

Specialized Tours is a Minnesota corporation owned by Donald Monson (Monson) and W.W. Schulz (Schulz). The two jointly owned Specialized Tours prior to the purchase of Dittmann, but Monson acquired Schulz's interest before the sale was consummated. Monson and Schulz believed this transfer would facilitate negotiations because Schulz had previously worked with Hagen but left Dittmann after a disagreement. After the sale, Schulz reacquired his share of Specialized Tours. Monson intended that Schulz be actively involved in Dittman after the sale and, in fact, this occurred. Although Monson and Schulz were knowledgeable in the retail travel business, both possessed little experience in the public charter business.[1]

### 2. *The Negotiations.*

In late 1978, Monson inquired of Hagen whether Dittmann might be for sale. Between February 6, 1979 and late April 1979, the two met approximately a half-dozen times to discuss the sale. On March 26, 1979, they met with Monson's accountant. At that time, Hagen furnished copies of Dittmann's financial statements and income tax returns for 1974 through 1978. Sometime after May 24, 1979, Hagen pro-

---

1. The retail travel business and the charter travel business differ significantly. The retail travel business involves selling airline tickets, making other transportation and travel accommodations for persons traveling on scheduled airlines or other carriers, and selling group tours organized and operated by other agencies. In contrast, the charter travel business involves the design and sale of a tour. The charter tour agency directly charters its aircraft (or other travel arrangement) and purchases ground accommodations prior to the sale of the tour to individuals and other travel agencies. Planning and marketing of a charter tour generally requires a lead time of approximately one year. The charter travel business entails a greater business risk than the retail travel business because a charter operator must itself contract for the airplanes and ground accommodations before promoting and selling a tour.

vided Monson and his accountant with an unaudited April 30, 1979 mid-year balance sheet.

The pre-sale discussions were general in nature. The bulk of the discussions concerned the history of the business, the operation of the business, its profitability, and some general projections of earnings for the 1979 and 1980 tour season. Hagen volunteered little detailed information, assuming Monson was experienced enough in the travel business to know what information was needed. Monson and his accountant could inspect all records and files of the company except during business hours. During the negotiations, Monson represented that he had 14 years of experience in the travel business and indicated that he and William Wardwell (Wardwell), who had 25 years' experience, would actively manage the business. Monson also supplied Hagen with his personal financial statement. This information satisfied Hagen that Monson could afford to purchase and properly operate the business. Despite these representations to Hagen, however, Monson never intended to be more than an investor in the business. Moreover, Monson never informed Hagen that Schulz, who currently owned and operated a competing travel agency across the street from Dittmann, would be a half-owner of the business and would oversee its operation and management by Wardwell.

A major portion of Hagen's plans for Dittmann's 1980 tour season was running tours to Bavaria with emphasis on the Oberammergau Passion Play. The Passion Play is a special event occurring every tenth year. Hagen told Monson that he had 15 aircraft under contract and had ordered five more to service the Oberammergau tours. Hagen also stated he had ordered arrangements for the Passion Play tickets and had sent a token deposit. Although Hagen did not specifically inform Monson the tickets were not confirmed, Monson fully understood this fact. Hagen did not notify Monson when and what amounts would be due from Dittmann in order to secure the planned Oberammergau arrangements. Hagen assumed Monson would know that substantial payments would be due in advance to cover the tour expenses. This special event expected to increase Dittmann's gross revenues by $3 million, would require more working capital.

At one meeting, Monson specifically inquired whether additional capital would be required over and above the down payment. Hagen responded that the question was difficult to answer. Hagen noted "a lot was up to Monson" and the answer depended to a great degree on how Monson operated the business, how he promoted the tours and how quickly he "turned-over" the paperwork necessary to secure participants' deposits in the traditional manner. He said it further depended on the success of the 1979 fall tours and the 1980 winter tours. Hagen also informed Monson that he had no plans to raise additional capital.

During the negotiations, Monson consulted with his accountant to determine a reasonable purchase price for Dittmann. After evaluating all the requested information, including the unaudited mid-year balance sheet, the accountant advised Monson that a purchase payment of $525,000 was reasonable if the proper portion was allocated to a covenant not to compete.

Between April 23 and May 2, 1979, Monson and Hagen exchanged written offers. Ultimately, Hagen accepted Monson's written offer of May 2. On several occasions the parties met with their attorneys to work out the language of the purchase agreement. The $525,000 purchase price was payable $100,000 down with the balance payable in installments secured by the Dittmann stock. The agreement allocated $350,000 for the purchase of 100 percent of Dittmann's stock and $175,000 for a covenant not to compete.

At the closing on July 3, 1979, Monson requested, and Hagen agreed, that the down payment be held in abeyance until noon on July 9 to afford Monson an opportunity to inspect Dittmann's business records before deciding whether to complete the purchase. On the evening of July

3, Monson and Wardwell inspected Dittmann's records, primarily to determine whether the Oberammergau tour aircraft were under contract and whether the Passion Play tickets were ordered. Hagen provided all information requested and showed Wardwell the airline contracts. Hagen also showed Monson two letters from Dittmann's German supplier of travel and accommodation arrangements, Terramar GmbH (Terramar), indicating the tickets had been ordered.

On July 9, 1979, Monson advised Hagen that he (Monson) had completed a satisfactory inspection of the business records and he wished to proceed with the closing. The down payment was then released to Hagen, and Monson took over the business.[2]

### 3. *The Breach.*

Monson made payments for July, August, and September 1979 but did not make the payment due November 1, 1979. On November 19, 1979, Hagen gave Monson a notice of default. Under the agreement, Monson had 60 days to cure the default, during which time Hagen was precluded from seeking legal remedies.

Following Hagen's refusal to tender rescission, Specialized Tours brought the instant action on the 58th day. Specialized Tours also obtained a temporary restraining order preventing Hagen from foreclosing on the escrowed corporate stock until a hearing could be held on its request for a temporary injunction. At this time, Hagen and his attorney learned for the first time Monson had not placed the corporate stock in escrow as required by the agreement.

Following a hearing, the court denied Specialized Tour's motion for a temporary injunction and ordered Monson to cure the pending defaults within 30 days. Within the 30–day period, Monson placed the stock in escrow and brought all payments current to within 60 days of when due. Thereafter, Monson continued to make payments, within 60 days, through October 1980 when all payments ceased.

### 4. *Treasury Stock Problem.*

Because of cash flow problems in late 1979 and early 1980, Monson and Schulz advanced $250,000 to Dittmann in November 1979 and February and March 1980. As security for the advances, the corporation pledged 400 shares of treasury stock to be issued to Monson and Schulz on January 1, 1981 if the advances were not repaid, which, in fact, occurred. This transaction reduced Hagen's security interest from 100 percent of the corporate stock to 20 percent of the corporate stock. Monson and Schulz, however, continued to own 100 percent of the stock of Dittmann.

### 5. *Civil Aeronautics Board Escrow Regulations.*

As a part of the sales agreement, Hagen represented the accuracy of the April 30, 1979 balance sheet attached to the agreement. Moreover, he warranted that, to the best of his personal knowledge, Dittmann was in compliance with all applicable laws, rules and regulations of the city, county, state and federal governments.

On September 24, 1979, the Civil Aeronautics Board (CAB) conducted a routine audit of Dittmann which disclosed that Dittmann's escrow accounts did not fully conform with current CAB regulations. The applicable CAB escrow regulations as found by the trial court were as follows:

> From August 15, 1978, until July 1, 1979, CAB regulations provided, in pertinent part, that all tour customer payments be placed in an escrow account at a bank with one account for each tour; that those funds not be used until 60 days prior to the tour's departure date (except

---

**2.** Before the closing, the parties disagreed about how to handle the accuracy of the April 30, 1979 mid-year balance sheet. Hagen did not want to warrant the accounts payable item in this financial statement because it was the busiest part of Dittmann's fiscal year and this account could be grossly misstated. Accordingly, Hagen offered to audit the April 30 statement or delay sale until the end of Dittmann's fiscal year—October 31, 1979. Monson, however, wanted the business immediately and a warranty agreement was consummated.

to make refunds for cancellations) at which time the account could be drawn upon to pay the airline in full; that following the airline payment ground operators could be paid directly by the bank but only to the extent of 80% of the full amount of the escrow account. Any remaining funds could be withdrawn by the charter operator but not until 5 days after the tour returned at the earliest. 43 Fed.Reg. 36604 (1978), codified at 14 C.F.R. § 380.20 et. seq. (1979).

Had Dittmann been in compliance with the regulations, its escrow account should have contained $251,787. Dittmann's April 30, 1979 balance sheet showed the cash account to contain $100,269 and the escrow account to contain $86,344, or $165,443 less than necessary to meet the regulation requirements on that date. The CAB did not review Dittmann's operations for any periods of time before the sale.

The regulations involved became effective on August 15, 1978 with amendments effective on May 1, 1979 for charters scheduled to depart on or after July 1, 1979. Hagen, however, did not have personal knowledge of these CAB regulations. His office manager who handled the escrow accounts, did receive information concerning the escrow requirements just prior to the sale.

The record reveals that Dittmann was not fully complying with the CAB regulations. Although Dittmann generally deposited tour customers' initial $100 deposits in the escrow accounts, Dittmann deposited some of the final payments in its checking account and paid some of the tour expenses prior to the time permitted. There was no claim by Monson or the CAB, however, that Dittmann was missing any money.

After the audit, Monson notified the CAB that he would bring the escrow accounts into compliance. He was able to do so by depositing an additional $1,488 in escrow. Dittmann received no fine or other penalty.

### 6. *The April 30, 1979 Balance Sheet.*

The April 30, 1979 mid-year balance sheet warranted by Hagen was prepared in accordance with an accounting method that recognized income and expense of its tours when the participants were billed. Dittmann traditionally used this accounting method, and after Monson's and Schulz's purchase, Dittmann continued to employ this method in preparing its financial statements up to the time of trial. Throughout this litigation, however, respondent Specialized Tours continually asserts that this method is not in accordance with generally accepted accounting principles. It claims the failure to use these accounting principles amounted to fraud, giving rise to damages under common law fraud and the Minnesota Securities Act.

Generally accepted accounting principles would require an income item to be recognized when the service is performed and an expense item to be recognized when the service for which liability is incurred is performed.[3] Accordingly, the accounting method utilized by Dittmann recognized income and expense too early. This fact was not disclosed on the unaudited balance sheet, and conventional accounting principles require such disclosure.

Had generally accepted accounting principles been used in the preparation of Dittmann's April 30, 1979 balance sheet with respect to recognizing income and expense, the balance sheet would have shown:

(a) An additional deficit in Dittmann's retained earnings account of $85,008;

(b) An increase of $37,866 in Dittmann's account payable account;[4]

---

3. In the case of a charter tour, generally accepted accounting principles require that liability not be incurred before the date of departure of the tour, that being the date when services are first provided to participants. The income from the tours should also not be recognized prior to the departure of the tours. (Amended Finding 27, A–102). An expense not related to a particular tour is to be recognized when incurred.

4. Between April 30, 1979 and July 3, 1979, the $37,866 in undisclosed accounts payable was paid off in the manner provided for in the sales agreement.

**528**

(c) A deficit of $67,452 in Dittmann's stockholder's equity, or $85,008 less than stated.

Based upon the "undisclosed" deficit in Dittmann's retained earnings account, the trial court determined the value of Dittmann on April 30, 1979 to be $462,050. To reach this numerical value, the trial court used the same method of valuation employed by Monson's accountant in determining a reasonable purchase price.

Between April 30, 1979 and July 3, 1979, Dittmann also made a number of payments to Hagen. These payments totaled $72,-500. Dittmann distributed $33,000 to Hagen as accrued salary. The balance sheet reflected this amount as a liability. Another $20,000 consisted of loan repayments to Hagen and was also shown on the balance sheet. The trial court found the payments to Hagen were within the usual and normal course of Dittmann's business.

### 7. The Oberammergau Problem.

Hagen commenced planning the 1980 tours to Bavaria in late 1977. The primary feature of the tours was to be the Oberammergau Passion Play. From Terramar, his German contact for accommodations, he learned in October 1978 that all arrangements ordered before October 1, 1979 required 50 Deutschemark (DM) deposit per play ticket plus 5 DM for postal expenses with payment of the balance before October 1, 1979. Oberammergau confirmed reservations only upon receipt of the down payment.

The Oberammergau tours were to be run in a "back-to-back" sequence from June through September 1980. Each airplane had a capacity of 252 passengers. Dittmann offered two separate tours. One was the Inzell tour which landed in Munich where participants were provided with a rental car and private accommodations in Inzell. Participants had no set itinerary, but were to be provided with a ticket and bus transportation to the Passion Play in Oberammergau. The second tour was a bus tour where the participants landed in Munich and then embarked on an escorted motor coach itinerary. The itinerary included an overnight stay in Oberammergau and a ticket to the Passion Play. Each charter was strictly divided into 126 Inzell participants and 126 bus participants. Tickets to the Passion Play were integral to the success of the planned tours.

When negotiating the sale to Monson, Dittmann had 20 airplanes under contract, and had firm plans for 16 plane loads. The bus tours were to have accommodations in Oberammergau. Those tourists on the "Inzell-car package" were to be provided with the least expensive accommodations in Oberammergau as a "throw away" to obtain Passion Play tickets should tickets without accommodations be unobtainable.

In May 1979, Terramar agreed to prepay a 103,000 DM down payment for the Oberammergau bus tour arrangements, with Dittmann to pay 26,000 DM in May, June, July, and August, 1979. Hagen made only one of the two payments due prior to the sale. An additional 103,000 DM deposit for the Inzell tours was required no later than September 1, 1979. Thus, before consummation of the sale to Monson, Hagen knew of these deposit requirements.

Hagen also knew that payments for all Oberammergau arrangements were due in full by October 1, 1979. Based on sixteen charters, each having one-half Inzell participants and one-half bus tour participants, Hagen knew by mid-May, 1979 that a total of 835,592 DM was due for Oberammergau by October. At an exchange rate of $.535/DM, Hagen knew that Dittmann would have to pay $444,366.72 by October 1, 1979.

Hagen was not asked and did not disclose to Monson by July 9, 1979, the existence of the down payment schedule, that all tickets had to be fully paid by October 1, 1979, or that the Oberammergau tickets had not been confirmed. All this information, however, was in Dittmann's files to which Monson and his accountant had access prior to closing.

Eventually Monson learned from Terramar that unless the payments were timely

made, the orders would be cancelled. Thus a payment in excess of $490,000 was required approximately eight months before the departure of the first tour and at least six months before tour participants' payments could be used in accordance with CAB escrow regulations. Dittmann borrowed $525,000 to meet these obligations and incurred interest expenses in excess of $140,000.

In February 1980, Terramar advised Dittmann of its lack of success in obtaining tickets. Failure in timely making the deposits, plus the failure of Terramar to transmit payments made by Dittmann to Oberammergau was apparently the cause of Terramar's failure to complete arrangements for the Inzell tours.

Dittmann subsequently obtained additional arrangements for the Inzell tours on the "black market" through Matterhorn Travel Agency (Matterhorn). In order to obtain the necessary tickets, Dittmann was required to buy all land arrangements for the Inzell tours from Matterhorn. Matterhorn provided these arrangements at a greater expense than would have been charged by Terramar. The total out-of-pocket cost to Dittmann for securing these arrangements was $159,693. Terramar ultimately returned all payments made by Dittmann for the tickets it was unable to secure. Under a settlement agreement releasing Terramar from all liability, Terramar paid an additional $13,751.

Eventually Dittmann ran 14 Oberammergau tours in a back-to-back series. Due to a large increase in price, a reshuffling of many flights, and a strike in the airline business, there were approximately 1,500 cancellations. Between August 1979 and March 1980, Dittmann borrowed $810,000 because of cash flow problems, caused in part by the new CAB escrow regulations, and the $490,000 Oberammergau payments.

### 8. *The Change in Location of Dittmann's Office.*

In January 1980, the office of Dittmann was moved from its location at the date of sale to offices located above the V.I.P. Travel Center office. V.I.P. Travel is the travel agency owned and operated by Schulz and is across the street from Dittmann's old location. Following the move, access to Dittmann was only through V.I.P. or a rear alley entrance. Moreover, Dittmann's retail operation was terminated and retail tickets were purchased by the corporation through V.I.P. Finally, Dittmann's appointments to write domestic and international air tickets were terminated.

### 9. *The Trial Court's Damage Findings.*

By judgment, the trial court awarded the following damages:

Damages awarded to Appellant Ronald D. Hagen:

| | |
|---|---|
| Balance of principal and accrued interest on purchase price | $442,308.80 |

Damages awarded to Respondent, Specialized Tours:

| | | |
|---|---|---|
| 1. | Overstatement of Dittmann's net worth | $ 62,950.00 |
| 2. | Unstated accounts receivable | 151.64 |
| 3. | Compliance with all laws, etc. | 7,511.09 |
| 4. | Failure to disclose Oberammergau prepayment | 52,351.06 |
| 5. | Failure to disclose tickets not secured | 159,693.00 |
| 6. | Interest pursuant to Minnesota Securities Act | 49,558.22 |
| 7. | Costs pursuant to Minnesota Securities Act | 2,555.00 |
| 8. | Attorneys' fees pursuant to Minnesota Securities Act | $ 76,476.12 |
| | Total | $411,246.13 |

The only damages not being appealed are $151.64 for unstated accounts receivable.

### A. *Breach of Contract/Warranty.*

Specialized Tours contends that Hagen breached certain warranties: (1) that the April 30, 1979 balance sheet did not accurately reflect the net worth of Dittmann on that date; (2) that Hagen breached a warranty that "to the best of seller's knowledge the corporation was in compliance with all laws, rules and regulations" when, in fact, it was not in compliance with CAB regulations; (3) that Hagen failed to disclose when Oberammergau payments were due; and (4) that Hagen's failure to dis-

close on the April 30, 1979 balance sheet accounts payable totaling $30,440 and his payments to himself were contrary to the agreements.

■ 1. *The April 30, 1979 balance sheet.* In the sale agreement, Hagen warranted the accuracy of the balance sheet.[5] It is undisputed the statement accurately represented the financial condition of Dittmann on that date according to the accounting method Dittmann had always used, a method used up to the time of trial by Monson in Specialized Tours, and a method recognized by the IRS. Respondent, however, contends Dittmann's balance sheet recognized income and expenses under an accounting method not in accordance with generally accepted accounting methods. Had such method been employed, the balance sheet's retained earnings account, according to respondent, would have been $85,008 less than was shown. The trial court accepted Specialized Tour's contention, and ruled this was a breach of the warranty.

The warranty on the accuracy of the balance sheet makes no mention of generally accepted accounting principles. This raises the crucial legal issue: was Dittmann's financial statement required to be prepared in accordance with generally accepted accounting principles? If Dittmann was under no legal obligation to follow generally accepted accounting principles, its balance sheet cannot be said to overstate net worth in violation of the agreement warranties. Rather, its balance sheet would be accurate based upon the accounting principles employed.

A number of factors weigh heavily in favor of the view that in this case, the financial statement need not have been figured according to generally accepted accounting principles. We note that the IRS accepts Dittmann's method of income/expense recognition as proper for income tax returns. *See* 26 U.S.C. § 446(c)(2) (1982). Dittmann's method of income/expense rec-

ognition was not employed to make the business look better at the time of the sale. Rather it was the method that Dittmann had traditionally used. Monson used the method he complains of in this suit. Dittmann's accountant, after the closing, asked Monson's new accountant to inform him of any discrepancies found in his audit of the balance sheet. Monson's accountant replied that the only difference was in the timing of income/expense recognition and that he should continue without changes. Considering these undisputed facts, the trial court's finding of a breach of warranty based on the April 30, 1979 balance sheet is clearly erroneous and cannot stand.

■ 2. *Compliance with Laws, Rules and Regulations.* ₒ Hagen warranted "[t]hat to the best of Seller's knowledge, the Corporation [Dittmann] has complied with all applicable laws, rules, and regulations of the city, county, state, and federal governments." The trial court found Hagen did not have personal knowledge of certain new CAB regulations concerning escrow accounts. Though the evidence was minimal, the court found that prior to the sale, Dittmann's office manager was aware of the new deposit regulations. The court then imputed that knowledge to Hagen, allegedly under agency principles, and concluded the warranty was breached.

We conclude as a matter of law the warranty was not breached. Hagen warranted only his personal knowledge. Since he was, in fact, unaware of any violations, he did not breach the warranty. The warranty clearly concerns only appellant's knowledge and not imputed knowledge. Were the warranty to be construed to include imputed knowledge, it would create an absolute warranty—a result clearly not within the contemplation of the parties.

■ But even if the warranty contemplated implied warranties, the imputation could arise only by piercing the "corporate veil." Generally an agent's knowledge is

**5.** The relevant portion of the purchase agreement on this claim states: [Section 2(d) ] "that said balance sheet fully and correctly reflects the assets, liabilities, and net worth of the Corporation as of said date," i.e., April 30, 1979.

only imputed to a principal—here the Dittmann Corporation. The trial court pierced the corporate veil based upon a finding that Hagen and Dittmann were one and the same; a finding of "alter ego." In justifying the "pierce," the trial court failed to set forth any elements required to prevent injustice or fraud. *See, e.g., White v. Jorgenson,* 322 N.W.2d 607 (Minn.1982); *Victoria Elevator Co. v. Meriden Grain Co.,* 283 N.W.2d 509 (Minn.1979). Absent such findings, its "pierce" was unwarranted.[6]

■ 3. *The Oberammergau Problem.* One paragraph of the purchase agreement, in essence, warrants that no material fact regarding the corporation (Dittmann) has been omitted which would reasonably affect a prudent investor's decision to purchase all of Dittmann's stock. Hagen claims he did not breach this warranty by failing to disclose the prepayment requirement for the Oberammergau arrangements. The trial court found he did.

While the question is close, we are unable to conclude the trial court's finding was clearly erroneous. Hagen claims: (1) he didn't know when the payments were due; (2) that he did disclose all information by making available to Monson during the "escrow period" all company records for inspection; and, (3) that he truthfully answered all questions asked by Monson and Wardwell because he assumed they were experienced enough in the travel business to have all the information they needed and wanted after asking questions. However, there was evidence from which the trial court could, as it did, conclude that during the negotiations Hagen was aware of the large down payments required for all phases of the tours.

Upon Monson's inquiry, Hagen showed him letters confirming airline charters for the Oberammergau tours, and orders for the pageant tickets. Although he knew at the time of the sale that substantial down payments had to be made for bus tour, car packages, and pageant tickets, Hagen did not inform Monson of the time or amounts

of the payments. The court held this failure to disclose constituted a breach of warranty. As the result of this breach, the trial court found Specialized Tours sustained damages of $52,351.06. Hagen claims the court improperly computed damages on the wrong amounts and from the wrong dates. A careful review of the record indicates the court meticulously computed the interest on the right amount (16 tours), and from the right time (September 1980). There was no error.

■ 4. *The Accounts Payable Problem.* Specialized Tours claims Hagen failed to include certain account payable items totaling $30,440 on the April 30, 1979 balance sheet, and this constituted a breach of warranty of paragraph 2 of the purchase agreement.

In material part, that paragraph provides that the account payable is stated in the balance sheet "according to information available on April 30 but individual accounts may increase or decrease due to ordinary business changes accruing or reported to Seller after April 30." By that paragraph, Hagen warranted that Dittmann had no liabilities as of April 30, other than those shown. The paragraph likewise required Hagen to satisfy accounts payable reported after April 30, 1979, except those arising afterwards in the ordinary course of business.

The trial court specifically found the information concerning the unreported accounts payable was not available to Dittmann as of April 30, 1979. The court also specifically found the undisclosed accounts payable were paid off prior to the closing. A careful examination of the record reveals that the trial court correctly found no breach of warranty here.

■ 5. *Payments from Dittmann to Hagen.* On January 15, 1979, Dittmann paid Hagen approximately $33,000, representing payment of the balance of $42,000 of accrued salary and bonus for 1978 as

6. Because this warranty was not breached, it is unnecessary to address the parties' contentions relative to the trial court's determination of damages.

shown on the 1978 financial statement. This was not unusual. Further, it had been the practice for Hagen each year to withdraw all earnings from the prior year from the subchapter S corporation. Also, on January 15, 1979, Hagen was paid $5,400, an interest payment on the $20,000 loan from Hagen to the corporation. Two payments were made to Hagen in May 1979 totaling $26,000 for repayment of the loan. The trial court correctly found these payments were in the usual and normal course of business. Each payment was legitimate, ordinary and was disclosed in the financial statements.[7]

### B. *The Fraud Claims.*

The trial court found Hagen committed fraudulent misrepresentations (1) in statements on the April 30, 1979 balance sheet and (2) in his failure to disclose that the Oberammergau payment was due within three months of the sale.[8] The court did not decide whether Hagen fraudulently failed to disclose the Oberammergau tickets were not secured. Instead, the court ruled the release of Terramar from liability also released Hagen as a joint tort-feasor on this claim.

#### 1. *Net Worth on the April 30, 1979 Financial Statement.*

■ The trial court ruled Hagen fraudulently misrepresented the net worth of Dittmann on the April 30, 1979 financial statement. The required elements of a fraud action are: (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing

whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance. *Burns v. Valene*, 298 Minn. 257, 261, 214 N.W.2d 686, 689 (1974); *Davis v. Re-Trac Manufacturing Corp.*, 276 Minn. 116, 149 N.W.2d 37 (1967).

The trial court premised its ruling of fraudulent misrepresentation, in part, on its earlier conclusion in the breach of warranty claim that the balance sheet overstated Dittmann's net worth. This, in turn, was based on the trial court's determination that the balance sheet was inaccurate because it was not prepared according to generally accepted accounting principles.

■ As stated in the discussion of the breach of warranty claim, the statements on the balance sheet were not inaccurate because they were based on an accounting method which recognizes income and expense earlier than generally accepted accounting principles. We there noted Dittmann's accounting method was recognized by the IRS, had been used since inception of the corporation, and was used by Specialized Tours subsequent to the sale. The statement of net worth of Dittmann on the April 30, 1979 balance sheet, therefore, cannot be termed a false representation. Since the essential element of a false representation is missing, this fraud claim must fail.

#### 2. *Cash Account on the April 30, 1979 Balance Sheet.*

■ The trial court determined Hagen overstated the cash account of Dittmann on the April 30, 1979 financial statement be-

---

7. Specialized Tours contends money paid to Hagen between January 1, 1979 and July 3, 1979 should have gone into the escrow account and remained there until the tours to which the money was associated had been operated. This is an entirely new issue not presented to the trial court. Therefore, it will not be considered on appeal. *In re Welfare of K.T.*, 327 N.W.2d 13, 16–17 (Minn.1982); *Republic Nat'l Life Ins. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 355 n. 2 (Minn.1979). For the same reason, we will

not consider respondent's request for an additional $85,008 in damages stemming from the method of income recognition on the April 30, 1979 balance sheet.

8. The court ruled against Specialized Tours on a fraud claim based on nondisclosure of the future capital needs of Dittmann. Respondent has not appealed this issue.

cause CAB regulations required more money be in the escrow accounts on that date. Based on this violation, the trial court ruled Hagen had fraudulently misrepresented the cash account of Dittmann on the balance sheet.

Evidence in the record does not support this holding. First, Hagen did not misrepresent the cash account. He represented a specific amount was in the account and that amount was there. He did not make representations as to what should have been in the cash accounts. More importantly, the element of knowledge is lacking. The trial court found Hagen had no personal knowledge of the CAB escrow requirements for public charters. Respondent urges us to overturn this finding as clearly erroneous. We decline to do so. The evidence reasonably supports the conclusion that Hagen had no actual knowledge of any violations of CAB regulations. Furthermore, Hagen did not have personal knowledge of any violated regulations as of July 3, 1979, when the sale was consummated. In light of the trial court's own finding of lack of actual knowledge, we reverse the court's ruling on this fraud claim as an error of law.

### 3. *Oberammergau Prepayments.*

 We affirmed the breach of contract claim based on Hagen's failure to disclose the Oberammergau prepayments due within three months of the sale. The trial court also found that appellant's failure to disclose the Oberammergau prepayment requirements constituted common law fraud and a violation of the Minnesota Securities Act. Minn.Stat. 80A.01(b). The evidence supports all three theories of liability, but Specialized Tours cannot be allowed double recovery based on the fraud claim.

### 4. *Failure to Disclose Oberammergau Tickets Unsecured.*

 After Terramar had failed to secure Oberammergau tickets and Specialized Tours, or Dittmann, secured them through another agency, respondent accepted $13,751 from Terramar in settle-

ment. Respondent claims this settlement did not relieve Hagen from claims respondent had against him because of the Oberammergau problem. The trial court, however, held respondent's settlement with Terramar released Hagen from liability for fraud based on the rule that the release of one joint tort-feasor releases others. *See, e.g., Holmgren v. Heisick,* 287 Minn. 386, 391, 178 N.W.2d 854, 858 (1970). The trial court noted the settlement did not reserve any rights to proceed against Hagen or have any other contemporaneous evidence indicating an intention to hold Hagen responsible for unrecovered losses. Respondent contends the trial court erred as a matter of law in releasing Hagen. It considers *Luxenburg v. Can-Tex Industries,* 257 N.W.2d 804 (Minn.1977), to be dispositive. However, even under *Luxenburg* the question is whether the injured party has accepted satisfaction in full for the injury sustained by him. *See also Gronquist v. Olson,* 242 Minn. 119, 64 N.W.2d 159 (1954). Thus, it is clear that one of the key factors is a factual determination of the intention of the release. *Id.* at 128, 64 N.W.2d at 165.

Respondent's present contention that Hagen and Terramar were not joint tort-feasors is contradicted by its stance at trial that additional expenses were incurred because appellant failed to timely make some down payments and because Terramar failed to transmit the required payments to the Oberammergau committee—in other words, that the two were *in pari delicto* or joint tort-feasors. Moreover, the evidence supports the trial court's conclusion. The settlement letter specifically states Terramar paid money to Dittmann "as a settlement to claims * * * for operations of the 1980 Oberammergau program." Reasonable people might have reached a conclusion supporting respondent, but there existed sufficient evidence to support the trial court's finding. Therefore, we cannot hold it was clearly erroneous.

### C. *Securities Act Violations.*

The trial court ruled Hagen violated anti-fraud provisions of the Minnesota Securi-

ties Act or "Blue Sky" law, in statements on the April 30, 1979 balance sheet. The court also ruled Hagen's failure to notify Monson the Oberammergau tickets had not all been confirmed violated disclosure requirements of the state "Blue Sky" law. The court awarded $159,693 in damages based on this nondisclosure. Appellant raises numerous objections to these rulings, including the applicability of the Act to the sale of Dittmann and the damages awarded under the Act.

### 1. Applicability of the Minnesota Securities Act.

A threshold issue in this case is whether the Minnesota Securities Act (Minn.Stat. §§ 80A.01–.31) applies to a directly negotiated sale of 100 percent of a company's stock. Appellant contends the trial court erred in finding a violation of the state securities act and awarding respondent interest, costs and attorney fees. The trial court found the 100 percent stock transfer from Dittmann to Specialized Tours was the sale of a "security" under the plain meaning of the statute.

The definitional section of the Minnesota Securities Act, Minn.Stat. § 80A.14, subd. 1 (1984) provides: "When used in sections 80A.01 to 80A.31, the terms defined in this section have the meanings given them unless the context otherwise requires." Subdivision 18 of the same section states: "'Security' means any note; stock; [or]

treasury stock." [9] Substantially the same definition of "security" is found in the Federal Securities Acts 15 U.S.C. § 77b(1) (Securities Act of 1933) and 15 U.S.C. § 78c(a)(10) (Securities Exchange Act of 1934).[10]

The Minnesota Statutes provide that the Minnesota Securities Act is to be construed so as to "coordinate the interpretation of sections 80A.01 to 80A.31 with the related federal regulation." Minn.Stat. § 80A.31 (1984). Thus, federal case law precedent on the issue is of considerable value.

The precise issue is whether the Minnesota Securities Act applies to a sale of a corporate business when the purchaser acquires 100 percent of the stock to operate the business without relying on the efforts of the seller.

Appellant Hagen urges us to hold that the Minnesota Security Act is inapplicable to the sale of a corporate business when the purchaser acquires 100 percent of the stock. This is known as the "sale of business" doctrine which does not consider a sale of a business through a stock transfer as a sale of a security within the meaning of the securities acts. The courts which have applied this doctrine in the past have focused on the economic realities underlying the transaction rather than rotely applying securities laws to transfers of instruments falling within the literal definition of security.[11]

---

**9.** The full text of Minn.Stat. § 80A.14, subd. 18, reads:

> **Security.** "Security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable shares; investment contract; investment metal contract or investment gem contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining right, title or lease or in payments out of production under the right, title or lease; or, in general, any interest or instrument commonly known as a security, or any certificate of interest or participation in, temporary or interim certificate for, receipt for guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

> "Security" does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum or periodically for life or for some other specified period.

**10.** The definitions of "security" in the two federal acts are "virtually identical." *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).

**11.** Various commentators have written extensively on the issue. *See, e.g.,* Black, *Is Stock a Security? A Criticism of the Sale of Business Doctrine in Securities Fraud Litigation,* 16 U.C.D. L.Rev. 325 (1983); Easley, *Recent Developments in the Sale-of-Business Doctrine: Toward a Transactional Context-Based Analysis for Federal Securities Jurisdiction,* 39 Bus.Law. 929 (1984); Orbe, *A Security: The Quest for a Definition,* 12

■ Strong legal arguments and sound policy considerations support application of the economic reality or sale of business test in Minnesota,[12] and were we writing on a clean slate, we would do so. However, since the time this case was briefed in this court, the United States Supreme Court has rejected the sale of business doctrine in *Landreth Timber Co. v. Landreth*, ——U.S. ——, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) and the companion case of *Gould v. Ruefenacht*, —— U.S. ——, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985). Because of this state's statutory policy mandating coordination of interpretation of the Minnesota Securities Act with related federal regulations and interpretations (Minn.Stat. § 80A.31 (1984)), we now feel constrained to follow those federal cases.[13]

In line with the analysis of the majority in *Landreth* and *Gould*, the Dittmann stock which was transferred to Specialized Tours possessed all of the characteristics associated with stock, and, thus, the sale of Dittmann was a securities transaction subject to the anti-fraud provisions under Minn.Stat. § 80A.01. In this case, we believe application of the act leads to an inequitable result. Although no *intent* to defraud was ever proven, nor found by the trial court, the total amount of costs, interest, and attorney fees awarded by the trial court under the act approaches punitive damages.[14]

## 2. *Constitutionality of the Minnesota Securities Act.*

■ Having decided the Minnesota Securities Act applies to the sale of Dittmann, we now address appellant's constitutional challenge to the act based on federal equal protection grounds. U.S. Const. amend. XIV. Hagen argues that by applying the state securities act to the sale of business through a stock transfer he is subjected to a stricter standard of disclosure than is imposed on persons who sell a corporation through a sale of assets. He contends

Sec.Reg.L.J. 220, 233–39 (1984); Seldin, *When Stock is Not a Security: The "Sale of Business" Doctrine under the Federal Securities Laws*, 37 Bus.Law. 637 (1982); Thompson, *The Shrinking Definition of a Security: Why Purchasing All of a Company's Stock is Not a Federal Security Transaction*, 57 N.Y.U.L.Rev. 225 (1982); Comment, *A Criticism of the Sale of Business Doctrine*, 71 Calif.L.Rev. 974 (1983); Comment, *Acquisition of Businesses Through Purchase of Corporate Stock: An Argument for Exclusion from Federal Securities Regulation*, 8 Fla.St.U.L.Rev. 295 (1980).

12. For example, (1) the "unless the context otherwise requires" language in Minn.Stat. § 80A.14, subd. 1 (1984) permits a construction that the act does not apply to the sale of a business through a stock transfer when the stock is merely a method of vesting ownership and not the sale of an investment instrument; (2) a holding that a sale of 100 percent of the stock in a business is the sale of a security, while the sale of 100 percent of the assets in a business is not, exalts form over substance; (3) a purchaser of 100 percent of stock in a negotiated face-to-face transaction does not need the protection of the Minnesota Securities Act because the anti-fraud provisions most often implicated in "sale of business" cases can be written into the sales agreement (as was basically done in this case) (4) adequate and parallel state common law causes of action exist to give a

remedy for fraud and misrepresentation claims; and (5) most parties to a sale of a business through a 100 percent stock transfer would never contemplate that the Minnesota Securities Act would apply to that type of transaction.

13. Justice Stevens dissented in both *Landreth* and *Gould*. *Landreth Timber Co. v. Landreth*, —— U.S. ——, 105 S.Ct. 2312, 85 L.Ed.2d 692 (1985) (Stevens, J., dissenting). He opined that the security laws were never intended to be applicable unless the transaction involved the sale of a security traded in a public market for investment purposes or the investor is not in a position to negotiate appropriate contract warranties and insist on access to inside information before consummating a transaction. He noted, "I do not believe Congress intended the federal securities laws to govern the private sale of a substantial ownership interest in these operating businesses simply because the transactions were structured as sales of stock instead of assets." *Id.*, 105 S.Ct. at 2313.

14. In passing, we note that if the Act is applicable under the facts of this case, then it is applicable to all arms-length directly negotiated transfers of closely held corporations, including incorporated small businesses and family farms. We question whether the legislature intended, or even contemplated, a result that, even in the absence of intent to defraud, would burden the seller with such punitive-like liability damages.

there is no reasonable basis for the differing treatment.[15] We disagree.

 Legislation is presumed valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Center,* —— U.S. ——, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Legislation is rational if the question is at least debatable. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981). When a business is sold through the transfer of assets, the assets alone pass to the buyer. When a business is sold through a stock transfer, the buyer assumes not only the assets of the corporation, but also the liabilities. This greater risk justifies greater protection for the stock purchaser. The stricter disclosure requirement, therefore, has a rational basis. We hold the Minnesota Securities Act constitutional as applied to the sale of Dittmann.

### 3. *Claims Under Minnesota Securities Act.*

The Minnesota Securities Act provides, in part:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

\* \* \* \* \* \*

(b) to make any untrue statement of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

Minn.Stat. § 80A.01(b) (1984). This provision is Minnesota's counterpart to Rule 10b–5 of the federal securities laws. *See* 17 C.F.R. § 240.10b–5 (1984).

#### a. *Accuracy of Financial Statement.*

 As previously indicated, the trial court felt the April 30, 1979 financial statement was inaccurate because it was not prepared according to generally accepted accounting principles and that fact was not disclosed on the statement. Based on this, the trial court held the statement also was misleading in violation of Minn.Stat. § 80A.01(b). As set out hereinbefore, we hold that the balance sheet was neither inaccurate nor did it contain any untrue statement of material facts. Dittmann traditionally used the accounting method long before sale negotiations between Hagen and Monson commenced; Monson's accountants for weeks prior to the closing had access to all of Dittmann's accounting and income tax records; and Specialized Tours to the time of the trial continued to use the accounting method of which it now complains. The material information—the accounting method—was not only discoverable, but it was available to Monson's own accountant before the closing. Thus, we hold that under the circumstances of this case, the trial court erred in holding the net worth in the balance sheets violated Minn. Stat. § 80A.01(b). In doing so we caution that our holding is limited to the facts of this case, particularly respondent's knowledge of the accounting system used and its nonreliance on generally accepted accounting principles. Under certain circumstances, not here existing, failure to disclose that a financial statement was not prepared according to generally accepted accounting principles might afford the basis of a breach of warranty or securities law violation claim.

#### b. *Compliance with Laws; Escrow Account.*

 The trial court, as a legal conclusion, ruled Hagen owed a duty to disclose a

---

**15.** Respondent urges us not to address the constitutional issue because it was not raised until the second set of post-trial motions and the attorney general was not notified in sufficient time to intervene. Minn.R.Civ.P. 24.04; *Campbell v. Glenwood Hills Hosps., Inc.,* 273 MInn. 525, 142 N.W.2d 255 (1966). First, appellant did give notice of challenge to the attorney general almost four months before the trial court ruled on the issue so there apparently was sufficient time to intervene. Secondly, the constitutional issue was briefed by both parties and is an issue of public importance. We have taken jurisdiction despite procedural flaws when we consider an issue of public importance. *See Elwell v. County of Hennepin,* 301 Minn. 63, 221 N.W.2d 538 (1974).

violation of the CAB escrow requirements on the balance sheet, and that because he did not do so, the escrow account was misleading in violation of Minn.Stat. § 80A.01(b). The court's legal conclusion is irreconcilable with its findings that Hagen had no actual knowledge of the CAB escrow requirements for public charters, and had no actual knowledge that Dittmann was in violation of any CAB rules as of the sales date. The record contains more than sufficient evidence to sustain these factual findings. Therefore, we hold the trial court improperly imposed on appellant a duty to disclose information of which he then had no knowledge.

### c. *Oberammergau Prepayment.*

Because today we affirm the trial court's rulings on the contract and fraud claims based upon nondisclosure of the Oberammergau prepayments, extended discussion of the security law claim is unnecessary. We affirm the trial court's ruling that failure to disclose the due date and size of the Oberammergau prepayments was a violation of Minn.Stat. § 80A.01(b).

### d. *Commitment of Oberammergau Tickets.*

The trial court concluded Hagen had misled Monson into believing the Oberammergau tickets had been "confirmed," and that, therefore, there existed a violation of Minn.Stat. § 80A.01(b).

It is undisputed that during the negotiations, Hagen told Monson tickets were "ordered" for the Passion Play. Indeed they had been and no one contends to the contrary. His statement that the tickets were "ordered" could not constitute an "untrue statement of material fact" under the state security law. It clearly appears in the record that Monson understood the tickets were ordered rather than confirmed.[16] Moreover, on July 3, 1979, Monson and Wardwell went to Dittmann's offices to

inspect business records primarily to determine whether the Oberammergau tour aircraft were under contract and whether the Passion Play tickets were ordered as represented. They then ascertained that both steps had been taken.

In light of those undisputed facts, the trial court's legal conclusion, that Hagen had a duty to disclose to Monson the difference between "ordered" and "confirmed," is perplexing. This transaction involves sophisticated businessmen on both sides. It is doubtful that Minn.Stat. § 80A.01(b) imposed upon Hagen a duty to educate Monson, an experienced businessman, on the difference between an "order" and a "confirmation" of tickets.

But even if the trial court did not err on this ground, it did err in finding a causal connection between the nondisclosure and the $159,693 awarded in damages. Proximate cause is an essential element of a fraud action, *Davis v. Re-Trac Manufacturing Corp.*, 276 Minn. 116, 117, 149 N.W.2d 37, 39 (1967), including an action brought under anti-fraud provisions of state securities law. *See also Royal Realty Co. v. Levin*, 244 Minn. 288, 291, 69 N.W.2d 667, 670 (1955) (false representation must be proximate cause of damages).

To recover damages for misrepresentation of the status of the Oberammergau tickets, Specialized Tours must prove those misrepresentations proximately caused $159,693 in damages. On proximate cause, Prosser has written:

In general * * * courts have restricted recovery to those losses which might be expected to follow from the fraud and from events that are reasonably foreseeable. * * * [I]f false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline in the market * * * or other factors in no way relate[d] to the representations will not afford any basis for recovery.

16. The transcript reveals that Monson testified as follows:
 Q. Do you claim that Mr. Hagen told you that he had guarantees for the tickets?

 A. I never said that I don't believe.
 Q. What he had told you was he had ordered them.
 A. Correct.

W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 110, at 767 (5th ed. 1984) (footnotes omitted).

Cases arising under section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)–5 are instructive on causation since our security law is to be interpreted in conformance to those statutes. In a recent case, *Bennett v. United States Trust Co.*, 770 F.2d 308 (2d Cir.1985), the Second Circuit Court of Appeals discussed the causal connection that must exist between a misrepresentation and injury before recovery is allowed under the securities statute. In holding that a plaintiff had failed to establish a *loss causation*—that the misrepresentation or omission caused the economic harm—as distinguished from the *transaction causation*—that the violation caused the plaintiff to engage in the transaction in question—the court in *Bennett* found no proximate relationship between the loss and the misrepresentation. *Id.* at 313–14. The court made the identical ruling on claims made based on violation of New York's Blue Sky Laws. *Id.* at 316. *See also In re Investors Funding Corp. of New York Securities Litigation v. Dansker*, 523 F.Supp. 533 (S.D.N.Y.1980) (under federal securities laws, statement must be proximate cause of injury), and *Eriksson v. Galvin*, 484 F.Supp. 1108 (S.D.N.Y.1980) (section 10(b) has requirement of causation in fact between the act and the injury).

■ At the July 3 closing, Monson asked that the down payment be held in escrow to give him an opportunity to examine the business records relative to the Oberammergau tours. By his own examination of the Terramar correspondence, he fully understood the tickets had been ordered but not confirmed.

Notwithstanding, he entered the transaction with full knowledge the tickets had not been fully secured. He now contends that Hagen's failure to disclose the payment schedule necessary to confirm the tickets caused Specialized Tours' failure to make the down payment for the Inzell tickets by September 1, thereby ultimately resulting in Terramar's failure to obtain the Passion Play tickets.

Our review of the evidence leads us to conclude that the trial court's finding of a causal connection between the alleged nondisclosure and the loss was clearly erroneous. The missed payment was not the reason the Passion Play tickets were not obtained. The reason they were not obtained was that Terramar negligently failed to transmit payments remitted by Dittmann to the Oberammergau committee as promised. This resulted, in turn, in the failure of Terramar to make necessary arrangements for one-half of the Inzell tours. Terramar also tried to obtain tickets without accommodations in Oberammergau but such tickets were not obtainable. When informed of this, Dittmann, now operated by Monson, resorted to purchasing tickets through Matterhorn, which ultimately was able to obtain the tickets for Dittmann on the "black market" at a cost substantially above the official Oberammergau prices. In addition, Matterhorn insisted on having all of the travel business. This resulted in Dittmann cancelling many of the arrangements which Terramar had already made at the official Oberammergau prices, and, in turn, paying inflated costs for those same arrangements from Matterhorn. None of this extra cost was causally connected with any alleged misrepresentation by Hagen. Hagen cannot be legally held to be causally responsible for the $159,693 loss allegedly sustained by Specialized Tours.[17]

---

17. Hagen sold one of the largest public charter businesses in the country for $525,000. In spite of all the financial problems of Dittmann in 1980, the business came very close to meeting the pre-sale projection of $5 million gross sales. Much of the financial problems of Dittmann had nothing to do with Hagen. For example, Capital Airways went on strike. This affected some of the Oberammergau flights, resulting in

additional costs to Dittmann. The value of the dollar dropped drastically with respect to Deutschemarks increasing the cost of foreign land arrangements for the Oberammergau tours. The increase could not be passed on to the tour customers because the selling price had been printed on brochures. Simultaneously, the price of aircraft fuel increased substantially resulting in plane fare increases of as much as

### e. *Applicability of Minn.Stat. § 80A.23 (1984).*

Because of our rulings, it is unnecessary for us to address contentions of appellant Hagen that respondents cannot recover under the Minnesota Securities Act because of Monson's "unclean hands." Appellant's reliance on Minn.Stat. § 80A.23, subd. 9 (1984) is misplaced. Neither *McCauley v. Michael,* 256 N.W.2d 491 (Minn.1977) nor *Logan v. Panuska,* 293 N.W.2d 359 (Minn. 1980) support appellant's claim. In the case at bar, even if one could conclude Monson was less than innocent, he was not *in pari delicto* with appellant in the sense the plaintiffs were in those two cases.[18] As a purchaser, Specialized Tours is afforded protection under the Blue Sky Law.

### f. *Costs awarded under the Minnesota Securities Act.*

The trial court awarded Specialized Tours interest of $49,558.22, costs of $2,555.00, and attorney fees of $76,476.12 [19]—or a total of $128,589.34. In challenging those awards, appellant contends that the trial court's interpretation of Minn.Stat. § 80A.23, subd. 2, resulted in unconscionable and unreasonable awards when there existed no proof or finding of intent to deceive, willful indifference, or bad faith on his part. Whatever appeal appellant's equitable argument may contain, it is dashed by the command of the statute which leaves no room for court discretion. The statute states damages under the Minnesota Securities Act *shall* include "actual damages sustained plus interest from the date of * * * sale, costs and reasonable attorney's fees." Minn.Stat. § 80A.23, subd. 2 (1982). Thus, the mandate allowing recovery of those items is clear.[20] The question is whether respondent is entitled to recover those charges as found by the trial court, when on this appeal most of the alleged Minnesota Securities Act including an alleged overstatement of Dittmann's net worth of $62,950; and alleged misrepresentation of compliance with all laws resulting in damages of $7,511.09, and an alleged misrepresentation by failure to disclose that Oberammergau tickets had not been secured with an award of damages of $159,693. In this opinion we have held none of these items constituted a violation of the Minnesota Securities Act. We did, however, affirm the trial court's finding of a securities act violation by appellant's failure to disclose the Oberammergau prepayment requirement resulting in damages of $52,351.06.

---

$220 per person for the Oberammergau tours. Under CAB regulations, passengers could, and did, cancel out of the tour. All these factors combined with Terramar's inability to obtain Passion Play tickets without accommodations to contribute to Specialized Tours' financial woes in 1980.

18. The common law defense of *"in pari delicto"* provides that in a case of equal or mutual fault the position of the defending party is the better one. *See* Black's Law Dictionary 711 (5th ed. 1979). The application of this defense to federal securities laws violations has been severely restricted by the United States Supreme Court in *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). The court held that a private action for damages may be barred by the plaintiff's own culpability "only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of the suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Id.,* 105 S.Ct. at 2629. The court noted it had previously rejected the "unclean hands" defense because it would seriously hinder rather than aid the real purpose of federal securities laws. *Id.* (citing *A.C. Frost & Co. v. Coeur d'Alene Mines Corp.,* 312 U.S. 38, 61 S.Ct. 414, 85 L.Ed. 500 (1941)).

19. The amounts awarded were based upon findings of alleged violations of the Minnesota Securities Act.

20. We need not in this case decide whether Minn.Stat. § 80A.01(a) requires scienter by the actor. *See, e.g., Jenson v. Touche Ross & Co.,* 335 N.W.2d 720, 729 (Minn.1983). Minn.Stat. § 80A.01(b) appears to parallel section 17(a)2 of the Securities Act of 1933 (15 U.S.C. § 77q(a)(2) (1982), which does not require scienter. *See Aaron v. Sec. and Exch. Comm'n,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Because the Minnesota Securities Act is to be construed to coordinate the act with related federal regulations (Minn.Stat. § 80A.31), we conclude that with respect to the trial court's finding, which we herein affirm, that appellant omitted to state a material fact concerning need for the Oberammergau prepayments, that respondent recover at least some of the interest, costs and attorney fees is mandated. Minn.Stat. § 80A.23, subd. 2.

ties Act damages were disallowed. We believe that respondent is not.

(i) Interest.

Although Minn.Stat. 80A.23, subd. 2 (1982) provides for an allowance of interest on an award following a statutory security law violation, it fails to specify the rate of interest. The trial court awarded respondent prejudgment interest at the legal rate of six percent per annum. *See* Minn.Stat. 334.01, subd. 1 (1982). Respondent now contends that interest should have been awarded at a higher "reasonable rate."[21]

The statute relied upon by the trial court, Minn.Stat. § 334.01 (1982) provides: "The interest for any legal indebtedness shall be at the rate of $6 upon $100 for a year, unless a different rate is contracted for in writing." Thus, we conclude the trial court correctly awarded six percent interest.

The inquiry does not end there. Since respondent will recover under the security act damages in the amount of $52,351.06 due to failure to disclose the Oberammergau ticket commitment, prejudgment interest should be computed at the legal rate on that amount only from October 30, 1980.[22]

(ii) Costs.

By following the statute, Minn.Stat. § 549.02 (1982) and Minn.Stat. § 357.25 (1982), as well as Part I, Rule 11 of the Code of Rules for District Courts, the trial court awarded respondent $2,555 as costs. Respondent states it incurred accounting fees totaling $27,327. Respondent contends that it should be able to recover those accounting fees. In advancing this

contention, respondent urges an expansive interpretation of the word "costs" contained in Minn.Stat. § 80A.23, subd. 2 (1982) to include all accounting service fees incurred by a party to a Chapter 80A action.

We reject that contention. The awarding of witness fees for the accountants by the trial court was a discretionary act. Respondent produced no evidence to the trial court separating the portion of the accounting expenses related to the lawsuit from other matters. Finally, Rule 11, of the Code of Rules for District Courts, prior to a 1984 amendment, provided:

> The maximum amount which normally will be allowed [for expert witness fees] by a judge on appeal is $300.00 per day or fraction thereof for actual appearance in the court and giving testimony in addition to the usual mileage allowance and the amount allowed shall be in such amount as is deemed reasonable for such services in the community where the trial occurred and in the field of endeavor in which the witness has qualified as an expert. *No allowance shall be made for preparation* or in conducting of experiments outside the courtroom by the expert (emphasis added).

This rule applies to all district court civil actions. Respondents have failed to advance any compelling rationale to support a departure from the rule in this case.

(iii) Attorney fees.

After making findings of fact that respondent was entitled to recover approximately $282,500 for alleged security law violations, the trial court awarded respondent attorney fees in the amount of $76,-

**21.** In arguing for a higher rate of interest, respondent notes that appellant was awarded nine percent interest while it only received six percent. This argument is obviously irrelevant. Appellant's rate of interest was written into the sales agreement. Therefore, Minn.Stat. 334.01, subd. 1 (1982) does not apply to the award of appellant's interest. Secondly, respondent contends that since the money it borrowed to maintain Dittmann had an interest cost of 16 percent per annum, it should have received that amount. However, respondent forgets that the interest differential complained of was recovered, when proper, as a part of its legal damages. Were we to accept respondent's contention, therefore, we would be awarding interest on interest.

**22.** The trial court awarded interest of $8,891.16 on that claim from October 3, 1980, to December 1, 1982. On remand, further interest at the legal rate from December 1, 1982, to date of entry of judgment must be computed and added to the trial court's award.

476.12. Appellant contends that even if the damage awards had been sustained, the attorney fee awards were grossly unreasonable.[23]

The respondent was represented by three separate lawyers. Originally the trial court awarded attorney fees based on $50 per hour for each attorney. In a later post-trial order, the court increased the attorney fee award by allowing each attorney a fee based on $90 per hour rate, but disallowed 88 hours of time billed by Attorney Seeger "to disallow compensation for Attorney Seeger's services rendered after the addition of Attorney Gowan to the case."

Appellant contends the court erred in several respects. First, he argues, that since the trial only took 13 days, 104 hours of Seeger's time should have been disallowed. If the deduction was properly made, it seems equitable to us that only Seeger's hours connected with the trial itself were deductible. Clearly, this is what the trial court attempted to do. Appellant asserts that Seeger's partner, Attorney Ryan, should have had his hours reduced after the Gowan firm was retained in order to preserve consistency in the fee awarding analysis. In view of our disposition of this issue, on remand the trial court should address this issue with specific findings.

Finally, appellant vigorously asserts that an award of $76,476.12 as attorney fees is manifestly unreasonable. Appellant, represented by one attorney, incurred attorney fees of $26,575. A single attorney had to perform substantially the same services for him as the three attorneys did for respondent. Thus, appellant claims it is grossly unfair that he should have to pay for the respondent's luxury of having three lawyers.

While no reported case in Minnesota appears to address the issue of the proper approach to be followed by trial courts in determining reasonable attorney fees to be awarded to a partially successful claimant under the Minnesota Securities Act, we believe in this case, considering, among other factors, the ultimate results obtained, the attorney fees awarded cannot stand.

The trial court multiplied the total hours (as adjusted) by an hourly rate to arrive at a fee. Under federal statutes similarly authorizing awards of reasonable attorney fees to prevailing parties, the federal circuits initially utilized differing approaches. Apparently the Third, Seventh, and Ninth Circuits have disallowed fees for any work on unsuccessful claims. *See, e.g., Bartholomew v. Watson,* 665 F.2d 910, 914 (9th Cir.1982); *Muscare v. Quinn,* 614 F.2d 577, 581 (7th Cir.1980); *Hughes v. Repko,* 578 F.2d 483, 486–487 (3rd Cir.1978). *But see Sherkow v. Wisconsin,* 630 F.2d 498, 504–505 (7th Cir.1980). Other circuit courts have awarded fees for all hours spent by partially successful claimants' attorneys on nonfrivolous claims. *See, e.g., Northcross v. Board of Education of the Memphis City Schools,* 611 F.2d 624, 636 (6th Cir. 1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980); *Brown v. Bathke,* 588 F.2d 634, 636–637 (8th Cir. 1978). Some of the circuit courts have allowed attorney fees' recovery for hours spent on unsuccessful claims based upon an analysis of the relationship of the hours to the success realized. *See, e.g., Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir. 1980); *Jones v. Diamond,* 636 F.2d 1364, 1382 (5th Cir.1981); *Gurule v. Wilson,* 635 F.2d 782, 794 (10th Cir.1980); *Lamphere v. Brown University,* 610 F.2d 46, 47 (1st Cir.1979). An analysis of these cases clearly demonstrates that whatever approach has been taken by the circuit courts, the results obtained in the litigation are relevant to a determination of the ultimate fee award. When the Supreme Court of the United States examined this issue, it recognized the relevancy of the result obtained by the attorney for the prevailing party. *Hensley v. Eckerhart,* 461 U.S. 424, 103

23. Though not briefed or argued because the determination of the legal validity of the various claims of security law violations had not been reviewed and decided by this court, in the light of our opinion eliminating approximately 82 percent of the damages awarded by the trial court, the unreasonableness of the attorney fee award is even more apparent.

S.Ct. 1933, 76 L.Ed.2d 40 (1983). After determining that the claimant has been the prevailing party,[24] that Court indicated the starting point in determining a reasonable fee is ascertainment of the number of adequately documented hours expended on the litigation multiplied by a reasonable hourly rate. *Id.* at 433, 103 S.Ct. at 1939. From this initial ascertainment, hours not reasonably expended should be deducted. "Cases may be overstaffed, and the skill and experience of lawyers vary widely." *Id.* at 434, 103 S.Ct. at 1939.[25] The *Hensley* Court emphasizes that the product obtained by multiplying a reasonable rate by reasonable hours does not end the inquiry:

> There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation, two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?
>
> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case —counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." * * * The congressional

intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Id.* at 434–35, 103 S.Ct. at 1939–40 (citation omitted) (footnotes omitted).

After acknowledging that some exceptional cases might justify an enhanced award of attorney fees, the Court went on to state:

> If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

*Id.* at 436, 103 S.Ct. at 1941.

We are free to adopt our own standards to be applied by our courts in determining reasonable attorney fees recoverable under the Minnesota Security Act. We need not defer to the analytical approach of the federal courts in resolving these issues. We do believe, however, that the analysis of the Supreme Court in *Hensley* provides a sensible and fair approach to such determinations.

The trial court essentially limited its inquiry into reasonable attorney fees to determine hours expended times hourly rate. We remand to the trial court to follow a *Hensley*-type analysis and weigh the re-

**24.** For a definition of "prevailing party" see *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978) (success on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit).

**25.** In this connection, attorneys submitting data showing hours expended have an ethical obli-

gation to exclude excessive, redundant, or otherwise unnecessary hours from fee claimed. *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983). *See also Copeland v. Marshall,* 641 F.2d 880, 891 (D.C. Cir.1980).

sults obtained in recalculating proper attorney fees. In doing so, however, we commend to the trial courts of the state the admonition by Justice Powell in *Hensley:*

> It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award. When an adjustment is requested on the basis of either the exceptional or limited nature of the relief obtained by the plaintiff, the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained.

*Id.* at 437, 103 S.Ct. at 1941.

> g. *Specialized Tours' claim that Hagen is not entitled to full performance by respondent of the sales agreement.*

■ The trial court, after determining that Specialized Tours had breached the sales agreement in various regards held that Hagen was entitled to recover the full contract price plus interest at the contract rate.[26] Respondent contends the trial court erred, and that it should be excused from further performance.

Under the sales agreement, upon respondent's default, appellant Hagen was prohibited from pursuing legal remedies for enforcement of the contract or damages for its breach for a period of 60 days following breach. Appellant could have rescinded the contract in that 60-day period. Hagen refused to do so. Therefore, Specialized Tours contends it was compelled to commence this action to enforce its remedies. By the time the trial court had resolved all the issues, as far as respondent was concerned, it claims rescission was impractical. Thus, respondent argues, appellant's refusal to rescind denied Specialized Tours' right to elect the remedy of rescission by virtue of passage of time. Thus, respondent contends, relieving it of further performance under the contract in effect would be the money equivalent of rescission and would prevent alleged unjust enrichment.

The trial court's decision is not clearly erroneous. Actions taken by respondent such as, for example, diluting Hagen's security interest in 100 percent of Dittmann's stock, clearly supports the trial court's conclusion. Moreover, Specialized Tours itself is at least partially to blame for the passage of time that made rescission impracticable under the circumstances of this case. There was nothing to prevent respondent from initially seeking rescission instead of maneuvering to establish a relatively advantageous litigation position. Likewise, the facts suggest that respondent waited to see if the Oberammergau tours would generate profits projected in the sales negotiations before seeking legal redress of alleged wrongs. Also, if the original orders of the trial court had stood, as the court itself acknowledged, respondent would have realized a double recovery—damages for "decreased value" of Dittmann while simultaneously escaping liability for its "true value." Finally, by our disallowance of more than 80 percent of the damages awarded by the trial court, to relieve respondent of further performance, liability would result in gross inequity to appellant.

In sum, we reverse the trial court's award of damages to respondent Specialized Tours for (a) alleged breach of warranty and alleged fraudulent overstatement of Dittmann's net worth ($62,950 damages), (b) alleged breach of warranty and alleged fraudulent representation on compliance with all laws ($7,511.09 damages), and (c) alleged breach of warranty and alleged fraudulent failure for failure to disclose the Oberammergau tickets were not secured (damages awarded $159,693). We affirm the damage award based upon breach of contract and fraudulent failure to disclose the Oberammergau prepayment requirements ($52,351.06) and costs ($2,555.00) under the Minnesota Securities Act. We affirm the trial court's ruling that respondent is entitled to recover interest and attorney fees under the Minnesota Securities Act,

---

**26.** Originally the court ruled that Hagen's material breach of the contract excused respondent from further performance. However, on appellant's motion for amended findings, it reversed itself.

but remand to the trial court to redetermine the amount according to the rule set forth in this opinion. Finally, we affirm the trial court's order that appellant Hagen recover the full unpaid balance of the sales contract plus interest at the contract rate.