FIRST STATE BANK OF FLOODWOOD, Floodwood Agency, Inc., John F. Schilling, William J. Gravell,[1] Joseph Bullyan and Eugene J. Stowell, Plaintiffs,

v.

Jerry J. JUBIE, Irene M. Jubie, Kirk M. Suonvieri, Janine I. Suonvieri, Todd Jubie, Thomas Jubie, Kathie Jubie and Timothy Jubie, Defendants.

Civ. No. 5–91–86.

United States District Court, D. Minnesota, Fifth Division.

Oct. 23, 1993.

---

1. For the sake of consistency, we retain the caption as styled by the Plaintiffs in their original and in their Amended Complaint, inclusive of what appears to be a misspelling of "Gravelle."

John F. Bonner, III, Parsinen, Bowman & Levy, Minneapolis, MN, for plaintiffs.

Keith M. Brownell, Brownell Law Office, Duluth, MN, for defendants.

## ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge, pursuant to the consent of the parties as authorized by Title 28 U.S.C. § 636(c)(3), upon the Plaintiffs' Motion for Partial Summary Judgment in the following respects:

1. On Count One of the Plaintiffs' Amended Complaint for fraud committed

in violation of Title 15 U.S.C. § 78j(b) and ·17 C.F.R. § 240.10b–5.

2. On Count Two of the Plaintiffs' Amended Complaint for fraud committed in violation of Minnesota Statutes Sections 80A *et seq.*, [Regulation of Securities].

3. On Count Three of the Plaintiffs' Amended Complaint for fraud in the sale of securities in violation of Minnesota Statutes Sections 325F.68 through .70.

4. On Count Four of the Plaintiffs' Amended Complaint for common law fraud.

5. On Count Six of the Plaintiffs' Amended Complaint for breach of contract in that the Defendants purportedly failed to disclose information that was required under the terms of a contract.

6. On Count Twelve of the Plaintiffs' Amended Complaint for a declaration that the Retirement Account of the Defendant Jerry J. Jubie ("Jubie") is void.

7. On Count Thirteen of the Plaintiffs' Amended Complaint for common law fraud for the failure of the Defendants to disclose a Federal Deposit Insurance Corporation ("FDIC") action against Jubie.

8. On Count Fourteen of the Plaintiffs' Amended Complaint for breach of contract in that the Defendants allegedly departed from the "generally accepted accounting practices" that they had contractually agreed to follow.

9. On the Defendants' First Counterclaim, which seeks a recovery of damages for a wrongful termination of the Jubies' health benefits.

10. On the Defendants' Second Counterclaim which seeks damages for defamation.

11. On the Defendants' Third Counterclaim, which alleges that the Plaintiffs breached the terms and conditions of the Jubies' Retirement Agreement.

In addition, the Plaintiffs seek an award of their reasonable costs and attorneys' fees as would be permitted by Minnesota Statutes Sections 325F.68 through .70 and Section 8.31.

At a Hearing on the Motions, the Plaintiffs appeared by John F. Bonner III, Esq., and the Defendants appeared by Keith M. Brownell, Esq.

For reasons which follow, we grant the Plaintiffs' Motion for Summary Judgment as to the Second of the Defendants' Counterclaims, while the remainder of the Plaintiffs' Motions are denied.

## II. *Factual Background*

On October 9, 1988, Jerry J. and Irene M. Jubie ("Jubies"), both individually and as the sole shareholders of Floodwood Agency, Inc.,[2] entered into a Purchase Agreement with John F. Schilling ("Schilling"), William Gravelle ("Gravelle") and certain assignees, for the sale of all of the then available outstanding common stock of the First State Bank of Floodwood ("Bank"). The buyers agreed to pay the sum of 95% of the book value of the common shares if the Sellers owned 100% of the Bank's stock at the time of sale. The book value of the stock, as defined by the terms of the Agreement, was to be determined on or before October 30, 1987.

As pertinent to the issues presented by the Plaintiffs' Motions, the Purchase Agreement contained the following recitals[3]:

5. The Sellers [i.e., the Jubies] further represent that the books and records of the bank are kept in accordance with generally accepted accounting practices, and that the statements of the bank are true and accurate. * * *.

6. This sale is subject to approval by all required State and Federal regulatory authorities.

7. The Buyers [i.e., Schilling and Gravelle] represent that they will promptly

**2.** It appears from the file that the Floodwood Agency, Inc., is a Minnesota corporation which served as a "holding company" for the stock ownership of the First State Bank of Floodwood. At all relevant times up to August of 1988, the Defendants Jerry J. and Irene M. Jubie were executive officers, shareholders and directors of the Floodwood Agency, while the Defendant Timothy Jubie was an executive officer and director.

**3.** In view of their criticality to the issues pending before the Court, we recite the relevant particulars of the parties' purchase agreements at some length.

proceed with all due haste to provide the necessary documents to secure regulatory approval. In any event, they agree that they will apply for regulatory approval under the Change in Bank Control Act by October 17, 1987.

8. Buyers shall be permitted access to all State and Federal regulatory agency records, studies, audits and other information, including those performed by or on behalf of FDIC. Sellers shall arrange a meeting between the Buyers, representatives of FDIC and representatives of the Minnesota Department of Commerce, Banking Division, said meeting shall be on or before October 21, 1987.

9. Buyers shall be afforded access to all bank records for a detailed examination of the same, in order to determine that the bank conditions are as represented, and that all bank assets and liabilities are disclosed, that all bank practices are being conducted according to law and in conformance with good banking standards.

   \*     \*     \*     \*     \*     \*

12. In the event the Buyers, after an examination of the books, have any complaint with regard to the condition of the bank, they may void this transaction by a Notice to Sellers on or before October 16, 1987.

   \*     \*     \*     \*     \*     \*

14. Sellers agree that family loans, except brother's loans, will be paid or paid down to adequate security. Any family loan which becomes uncollectible in the future may be offset against amounts owing to owner or his wife pursuant to a Retirement Agreement between owner, his wife and the bank, which Agreement is dated March 10, 1987.

15. Said Retirement Agreement, a copy of which is attached hereto and marked "Exhibit A," shall remain in full force and binding on the bank; except that it is

agreed that the Agreement will be amended to provide: \* \* \* 2) If there is any cost to the bank for life and health group policies of insurance for the benefit of the Jubies, then and in that event, the Jubies will reimburse the bank for any expenses of that nature, it is [sic] being the intent of this Agreement that the Jubies be able to continue to maintain the life and health policies through the bank. 3) That the final two years payments, pursuant to said agreement, shall be forfeited if, during the two year period following the closing, the annual average outstanding balance of retail installment sales contracts acquired from Schneiderman's Furniture is less than 90 percent of the balance of said contracts at the date of closing.

   \*     \*     \*     \*     \*     \*

19. Sellers represent that during the negotiations preceeding [sic] this agreement and up until the time [of] closing, that the Seller [sic] will continue to operate the Bank according to law and in conformance with good banking standards. Seller [sic] shall contact Bank management daily to ascertain any information which materially alters the condition of the Bank. Any such information which Seller [sic] becomes aware of, or should have become aware of, shall be immediately disclosed to Buyers.

20. All recitations, covenants, warranties and conditions of this agreement shall survive the closing and will give rise to a cause of action or exercise of right of set-off for either Buyer of [sic] after closing.

The record before the Court establishes that both parties to this Agreement were represented by legal counsel.[4]

Due to delays in obtaining the approvals of the applicable State and Federal regulatory agencies, the parties[5] entered an "Addendum to Purchase Agreement" on July 28, 1988, which modified the terms and condi-

---

4. During the negotiations which led to the purchase of the Bank, the Plaintiffs were represented by Robert W. Boyd and Jerome P. Agnew, of Bye Boyd Agnew Ltd., and the Defendants were represented by A. Blake MacDonald, of MacDonald Munger Downs & Munger.

5. In addition to the parties previously referenced, Schilling and Gravelle assigned one-half of their respective interests in the prior Purchase Agreement to Joseph Bullyan and Eugene V. Stowell, in order that all of the buyers would have equal rights in the purchase of the Bank.

tions of the sale of the Bank.[6] Among its other recitals, the Addendum established the purchase price of the Bank at $528,582.00, which was 95% of the book value of the Bank, as disclosed by the Bank's financial statements for the period ending as of June 30, 1988. The stated purchase price was subject to certain adjustments including the "usual and customary month-end adjustments as made by [the Jubies'] accountant, Al Skur, whose judgment BUYERS [would] accept as to [those] adjustments."

In addition, Paragraph 4 of the Addendum provided in pertinent part:

> The BUYERS have objected to the BANK'S reserve for bad debts as being inadequate. The parties have agreed to settle this dispute by the SELLERS, individually and severally, guaranteeing the BUYERS and the BANK that in the event of default of certain loans, SELLERS will pay up to one-half of the present balance of said loans. The loans and the amount of the guarantee are as follows:

| | Total | Guarantee |
|---|---|---|
| U.M.D. Equipment | 25,500.00 | 12,500.00 |
| Kurtock | 27,000.00 | 13,500.00 |
| Mark Peterson | 34,475.00 | 17,238.00 |
| Rosenthal | 30,000.00 | 15,000.00 |

> At such time as the BANK has disposed of collateral or otherwise exhausted all judicial proceedings and reasonable collection efforts against the debtors on each of the above loans, the BANK shall notify the SELLERS of the amount of loss sustained by the BANK on that loan. * * * The BANK and BUYERS shall be permitted to proceed against the SELLERS for any amounts owing pursuant to this provision by any and all legal proceedings including the right to off-set amounts owing from the BANK to the SELLERS pursuant to the Retirement Agreement referred to herein and pledge as collateral for this guarantee. * * *

Consistent with the provisions of Paragraph 14 of the original Purchase Agreement, certain of the family loans were either paid-off, paid-down, or were guaranteed for payment by the Jubies. In this respect, Paragraph 6 of the Addendum provided in part:

> 6. The SELLERS hereby pledge and offer as security to the BUYERS and the BANK any an all sums owing to the SELLERS pursuant to that certain Retirement Agreement attached to the Agreement of the 9th day of October, 1987 (Exhibit A). Said pledge and security is offered for complete compliance of all of the covenants, conditions, and guarantees of the SELLERS in the Agreement of the 9th day of October, 1987 and this Addendum, including, but not limited to, the guarantees for the family loans and the loans mentioned in paragraph four hereof. * * *

The Addendum also scheduled the closing of the sale to occur on August 9, 1988, subject to the "completion of an Exit Conference by the Bank Examiners at which the BUYERS or their representatives [would have] an opportunity to attend, receive all reports and review all documents." By all appearances, the closing on the sale occurred, as scheduled, on August 9, 1988.[7]

As a part of the closing transaction, an Amendment to the Jubies' Retirement Agreement of March 10, 1987, was also consummated. Originally, in March of 1987, the Jubies and the other Directors of the Bank had negotiated a Retirement Agreement, ostensibly in consideration of Jubie's 21 years of "faithful service" to the Bank, which was signed and accepted by the Bank's Board of Directors. On August 9, 1988, the new Board of Directors, including each of the individual Plaintiffs in this action, agreed to a modification of the Retirement Agreement. According to the Plaintiffs, this Retirement Agreement should be negated because it was without consideration and because it was contingent upon an approval from the pertinent State and Federal banking authorities, which was never received. In response, the Defendants note that the Agreements in question were duly executed, on two separate occa-

---

6. The Addendum does expressly note that the parties had "recently obtained approval of the applicable governmental bank regulatory agencies" for the purchase and sale of the Bank.

7. Among other indicia reflecting a finalization of the sale are the resignations of Jerry J. and Irene M. Jubie effective on August 9, 1988.

sions by the Board of Directors of the Bank, and were duly memorialized in the Minutes of the Board's meetings.

As a further complication in the terms of the Bank's sale, the Plaintiffs allege that various monthly expenses for July of 1988 were not properly allocated in the accounts of the Bank and, accordingly, the purchase price of the Bank was overstated by an equivalent amount. The Defendants assert that the purchasers of the Bank arranged for a meeting between the Defendants' accountant and the purchasers' accountant in order to properly allocate the final month's expenses and that, at the Board of Director's Meeting of August 16, 1988, the purchasers approved the income and expense reports for the previous Month of July. The Plaintiffs allege that they were required to pay more than $80,000 for the Bank than would otherwise have been required if the pertinent expenses had been properly allocated.[8]

In addition to the foregoing, a number of events had transpired in the years prior to the sale of the Bank which have some relevance to our analysis of the pending Motions. For example, in the two-year period leading up to the date of that sale, the Bank was undergoing an investigation by Federal and State banking regulators, which arose from allegations that the Bank had been engaged in "unsafe and unsound practices" in violation of the applicable banking laws. Commencing its examination of the Bank's accounts on some undisclosed date, a report of that examination was issued on January 30, 1987—a year and one-half before the date of the Bank's sale.

Thereafter, on August 4, 1987, an informal meeting was held between the Assistant Regional Director of the FDIC and Jubie in certain proceedings which have been denominated as *In the Matter of Jerry J. Jubie, individually and as chief executive officer, director and principal shareholder of First State Bank of Floodwood, Floodwood, Minnesota and FIRST STATE BANK OF FLOODWOOD, FLOODWOOD, MINNESOTA* FDIC–87–199b. Following this meeting, on November 19, 1987, Jubie executed a Stipulation and Consent to the Issuance of an Order of Removal from Office and Prohibition from Further Participation, by which he waived a number of procedural preconditions to the FDIC's issuance of an Order that would remove Jubie from his office in the management of the Bank and would prohibit his participation in the management of any bank insured by the FDIC. Notably, Jubie's agreement was given without any admission or denial on his part of "any violations of law, rule, or regulation, any breaches of fiduciary duty, personal dishonesty, financial gain and/or any unsafe or unsound banking practices."

Pursuant to Jubie's stipulated consent and agreement, an Order was entered on February 4, 1988, in which the FDIC directed, in part, as follows:

1. Jerry J. Jubie is hereby prohibited from serving as an officer or director of, or participating in any manner in the conduct of the affairs of, any bank insured by the FDIC, without the prior written approval of the appropriate Federal banking agency, as that term is defined in section 3(q) of the Act, 12 U.S.C. § 1813(q).

2. Jerry J. Jubie is hereby prohibited from voting for a director of any bank insured by the FDIC, without the prior written approval of the appropriate Federal banking agency, as that term is defined in section 3(q) of the Act, 12 U.S.C. § 1813(q).

The terms of that Order became effective ten days after its issuance. Although the FDIC reported sending copies of this Order to the Board of the Bank on February 4, 1988, and on March 17, 1992, each of the Defendants has averred that they had no knowledge of the existence of the Order at the time that the sale of the Bank was consummated. Jubie denies the accuracy of these averments.[9]

On February 1, 1988, the FDIC issued its Order to Cease and Desist, which was also

---

**8.** The Plaintiffs specifically refer to the following expenses as having been improperly allocated by the Defendants on the books of the Bank: payroll expenses, insurance expenses, state examination fees, accrued vacation pay, legal fees, real estate taxes on the Mueller property, repairs to proper-

ty and costs attributable to Jubie's Retirement Agreement.

**9.** In his affidavit, Jubie asserts that each member of the Bank's Board of Directors received, by

entered upon the consent and agreement of Jubie and without any admission of wrongdoing on his part. By this Order, the FDIC directed Jubie and "the Bank, its directors, officers, employees, agents, successors, assigns, and other persons participating in the conduct of the affairs of the Bank," to cease and desist from a series of nine expressly stated forms of "unsafe and unsound banking practices and violations of law and regulations." Additionally, the same parties were directed to effectuate, within expressly defined time-limitations, various forms of affirmative responses, including the retention of managers of the Bank who would be acceptable to the Regional Director of the FDIC and the Commissioner of Commerce for the State of Minnesota, the development of a written management plan, the elimination of doubtful assets from the Bank's accounts, and the infusion of additional capital. All of the Defendants have admitted their knowledge of this Cease and Desist Order.

certified mail, a copy of the FDIC's Order. He goes on to state:

The purchasers had access to all of the examinations by the FDIC and also the Bank Commissioner of the State of Minnesota. They also had access to discussions personal with the FDIC. They knew everything that was possible to be known prior to the sale.

Insofar as the Plaintiffs have contended that they would not have proceeded with the negotiations and ultimate purchase of the Bank had they known of the FDIC's investigation of Jubie, Jubie has responded, in part, by asserting that was "the reason they bought the Bank so cheaply was because I did have this Order hanging over my head." Despite this observation by Jubie, we do note the somewhat anomalous circumstance that Jubie had agreed to a noncompetition clause, which was intended to preclude his engagement in any "business, trade or occupation similar to the business" of the Bank for a three-year period within a 150–mile radius of the Bank. Given his disqualification to participate in FDIC-insured banking activities, the value of such a noncompetition agreement may be subject to substantial question.

10. The Plaintiffs have specifically referenced the following as examples of irregular and non-conforming loans: Eino Tuominen loans; Kurtock loan; Peterson loans; Richard L. Silvola loan; Best Pac, Inc. loan; Gerald H. Groh FHA Title I loan; and, the Robert Mueller Contract for Deed.

11. In an affidavit that has been filed with the Court, legal counsel for the Defendants, who

In addition to the events which occurred before the sale of the Bank was finalized, the purchasers of the Bank conducted, in May of 1989, a "thorough internal examination" of the Bank's records, which purportedly disclosed "that Jerry J. Jubie, Timothy Jubie, and Irene Jubie had committed fraud on the Bank." Allegedly, the fraud had been accomplished "through insider loans, under collateralization of loans [which were] not in conformance with generally accepted banking practices, and [by] not properly recording information on the Bank's financial statement." [10] In turn, the Defendants have denied any wrongdoing and have asserted that each of the purportedly irregular loans were known to the Plaintiffs prior to their purchase of the Bank.[11]

The same allegedly irregular banking practices were reported to the Federal Bureau of Investigation ("FBI"), by representatives of the Bank in a report dated August 14, 1989.[12]

represented their interests during the sale of the Bank, avers that there was full disclosure to the Plaintiffs of each of the loans asserted to be irregular, and that the details of many of those loans were discussed at the closing of the sale and memorialized in the closing documents.

12. As to both Jerry J. and Irene M. Jubie, the Bank described their suspected criminal violations as follows:

Bank assets were diverted for personal use; illegally made loans that had been represented as guaranteed but are, in fact, not guaranteed; additional loans that are illegal and unapproved; unearned income that was treated as an asset; errors in computing interest on CD's and savings accounts; did not use generally accepted accounting practices for the books and records kept by the bank; altered existing loan documents and mortgages; falsified reports and disclosures to bank examiners; provided unauthorized discounts of loans; failed to report loans; fabricated appraisals; overvalued property on insider/family transactions; were negligent in keeping and maintaining minutes, records and other documentation; created an overline with respect to loans to directors, officers, employees and affiliates; involved the bank in sham transactions; were self-dealing with bank funds.

According to the report to the FBI, the Defendants had already commenced a State Court proceeding against the Bank, and the Bank had counterclaimed by raising certain of the same purportedly irregular loan transactions. While

In support of the propriety of this report, the Plaintiffs note that the governing regulatory law requires the Bank to report apparent violations of the United States Code, which involve or affect the assets or affairs of an "insured nonmember bank," and that the report to the FBI was made in a "good faith" effort to comply with those regulatory provisions. See, *12 C.F.R. § 353.1(a).*[13] In contrast, the Defendants have contended that the contents of the FBI report were both false and defamatory, and that, after an investigation by the FBI, the Bank's allegations were "found to have no substance in truth." The record fails to document any criminal charges that were asserted against any of the Defendants as a result of the FBI's investigations.

Lastly, we note a dispute between the parties that arose in February of 1990. As noted, the Amendment to the Jubies' Retirement Agreement provided that the Jubies would be entitled to continue their Life and Health Group Policy with the Bank, but at their own expense. In this respect, the Amendment provided:

> If the Bank shall not receive the policy premium by the 8th of the month when due, the Bank shall have the option of cancelling said policy and coverage without any further notice to Jubie.

Subsequently, the parties agreed to modify this arrangement such that the Bank was to receive Jubie's premium payment by the 15th of the month when due. By letter dated March 2, 1990, the President of the Bank, Gene Lindberg, wrote as follows to Jubie:

> Last month I sent the insurance billing to you on February 8th and today, March

2nd, I received your remittance for $397.69. Since your remittance was not at this bank by the designated date we are returning your check to you.

You are also aware that the bank has exercised its rights and is applying your retirement benefits to the loans you have guaranteed which are in default. The total $1,500 per month is going to those payments. Therefore, there is no amount left over to apply to your life and health group policy.

As a consequence of the tardiness of the Jubies' premium payment, the Bank cancelled the Jubies' Life and Health Group policy and coverage "effective immediately." The Defendants argue that the Bank was in possession of other moneys which were due and owing to the Jubies and which could have been applied by the Bank to the Jubies' group insurance premium. In reply, the Plaintiffs do not deny the receipt of these funds which, apparently, were segregated due to the pendency of litigation, but they do dispute any obligation on the Bank's part to apply those funds to the amount owing on the Jubies' insurance premium.

The Plaintiffs assert that, "[a]s a result of [the] misrepresentations of Mr. Jubie, the shareholders [of the Bank] have been required to contribute an additional $480,000 to cover the losses." The Defendants deny any knowledge or responsibility for any such losses, and assert that, if any losses occurred, they resulted from the Plaintiffs' mismanagement of the Bank's affairs. The amount of the damages that have been asserted in the Defendants' Counterclaims have not been de-

---

we are aware that many of the same issues raised in these proceedings have been asserted in a consolidated State Court action entitled *Jerry J. Jubie and Irene M. Jubie, husband and wife vs. First State Bank of Floodwood, a Minnesota Banking Corporation; Jack Schilling and William Gravelle vs. Timothy J. Jubie, Todd Jubie, Kathie C. Jubie, Kirk W. Suonvieri and Janine Suonvieri,* Court File No. 90–20–103, that action was not commenced until 1990, and the specific legal action referenced in the FBI report is not known to the Court.

**13.** In pertinent part, Section 353.1(a) provides as follows:

Whenever it appears that a criminal violation of the United States Code involving or affecting the assets or affairs of an insured nonmember bank * * * has been committed or attempted, then the bank * * * shall promptly report the apparent violation to the appropriate field office of the Federal Bureau of Investigation, to the appropriate office of the United States Attorney, and to the regional director * * * of the FDIC region in which the bank is located. * * * For purposes of this part, the phrase *apparent violation* implies that there is a reasonable basis for believing that a crime has occurred or is occurring, or may occur. [Emphasis in original].

tailed.[14]

## III. *Discussion*

For convenience and efficiency, we have categorized the Motions of the Plaintiffs and will address them in the following sequence:

1. The Defendants' fraud claims.

2. The Defendants' breach of contract claims.

3. The Defendants' First Counterclaim, which claims damages arising from a purportedly wrongful termination of the Jubies' health benefits.

4. The Defendants' Second Counterclaim, which seeks damages for alleged defamation.

5. The Defendants' Third Counterclaim, which asserts a breach of contract claim arising from the Jubies' Retirement Agreement, and the Plaintiffs' action to declare that Retirement Agreement void.

As noted, the Plaintiffs have sought an entry of Summary Judgment as to each of these claims, and we begin our discussion of the issues with a recitation of the applicable standard of review.

A. *Standard of Review.* Summary Judgment is neither an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut so long as there are no issues which require the unique proficiencies of a Jury to weigh the evidence and to render credibility determinations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A Summary Judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,[15] if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rule 56, Federal Rules of Civil Procedure.* For these purposes, a disputed fact is "material" if it must inevitably be resolved and that resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) ("An issue of material fact is genuine if it has a real basis in the record.").

As Rule 56(e) makes clear, once the moving party presents a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. While the Court views the evidence in favor of the nonmoving party and gives that party the benefit of every justifiable inference that may be drawn from that evidence, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but * * * must set forth *specific facts* showing that there is a genuine issue for trial." *Rule 56(e)*, [emphasis supplied]; *Honeywell, Inc. v. United States*, 973 F.2d 638, 641 (8th Cir.1992), citing *Ivan Spencer v. Kroger Company*, 941 F.2d 699 (8th Cir.1991); *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), cert. denied, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). The nonmoving party may not rest upon the mere denials or allegations of its pleadings, nor may it simply argue that operative facts will be subsequent-

---

**14.** By an affidavit dated June 30, 1993, Dr. Jerrold Peterson, an economist, has expressed the following opinion:

That in my estimation, if a Jury were to find for the Jubies, they could very well find damages to the above named Defendants in the amount equal to or in excess of $100,000.00. My calculations are based on the review of mr. [sic] Jubie's operating statistics, contracts with said Bank and Defendants and Purchase Agreement.

This expression of opinion is of no more probative weight than the allegations of a general *ad damnum* clause.

**15.** Both parties have submitted affidavit evidence for the Court's consideration. While such evidence can be crucial to support or defeat a Motion for Summary Judgment, we caution both parties that conclusory affidavits do not provide a meritorious basis upon which to grant or deny the Motion. *Armour and Company, Inc. v. Inver Grove Heights*, 2 F.3d 276 (8th Cir.1993); *Jackson v. Anchor Pkg. Co.*, 994 F.2d 1295, 1304 (8th Cir.1993); *Miller v. Solem*, 728 F.2d 1020, 1024 (8th Cir.1984) ("conclusive assertions of ultimate fact are entitled to little weight"), cert. denied, 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984).

ly developed which will support its claim. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, supra 475 U.S. at 586, 106 S.Ct. at 1355 ("[O]pponent must do more than simply show there is some metaphysical doubt as to the material facts."); see, generally, S. Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 188 (1987).

Moreover, a party is entitled to Summary Judgment where its opponent has failed "to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, supra 477 U.S. at 322, 106 S.Ct. at 2552. In such a case, no genuine issue of material fact will be found to exist because "a complete failure of proof concerning an essential element of [that party's] case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2553. If reasonable minds could differ as to the import of the evidence, Summary Judgment should not be granted and, in exercising its function, the Court is not to weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, supra 477 U.S. at 250–51, 106 S.Ct. at 2511–12; *Agri-Stor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987).

B. *Legal Analysis.* With these precepts in mind, we examine the Plaintiffs' Motions in turn.

■ 1. *The Plaintiffs' Fraud Claims.* The gravamen of the Plaintiffs' Complaint is encompassed within a series of allegations that the Defendants had engaged in a variety of activities which, under the governing statutory and common laws, constituted actionable fraud. Under Minnesota law,[16]

> [a] person is liable for fraud if he makes a false representation of a past or existing material fact susceptible of knowledge, knowing it to be false, or as of his own knowledge without knowing whether it is true or false, with intention to induce the person to whom it is made to act in reliance upon it, or under such circumstances that such person is justified in acting in reliance upon it and such person is thereby deceived and induced to act in reliance upon it, to his pecuniary damage.

*Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1017 (8th Cir.1984), citing *Swanson v. Downing*, 251 Minn. 110, 114, 86 N.W.2d 716, 720 (1957) and *Hanson v. Ford Motor Co.*, 278 F.2d 586, 591 (8th Cir.1960) (Blackmun, J.); *Rauenhorst v. United States*, 104 F.R.D. 588, 603 (D.Minn.1985); *Simonsen v. BTH Properties*, 410 N.W.2d 458, 460 (Minn.App.1987).

Although we are mindful of the Court of Appeals' observation that "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles," we decline to rest our denial of Summary Judgment solely upon that ground. *RJM Sales & Marketing v. Banfi Products Corp.*, 546 F.Supp. 1368, 1377

---

**16.** Although we expressly reference and quote the essential elements of an action in fraud, as expressed in the common law of the State of Minnesota, we note that these elements are equally applicable to the Plaintiffs' statutory fraud actions, at least as they have been alleged in their Amended Complaint. *Ligon v. Deloitte, Haskins & Sells*, 957 F.2d 546, 547 (8th Cir. 1992), and *Harris v. Union Electric Co.*, 787 F.2d 355, 362 (8th Cir.1986), cert. denied, 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986) [As to Title 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10–b5]; *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 536 (Minn.1986) [As to Minnesota Statutes Section 80A.01(a)]; *Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 850 (D.Minn.1989), *In re Professional Financial Management, Ltd.*, 703 F.Supp. 1388, 1397–98 (D.Minn.1989), and *LeSage v. Norwest Bank Calhoun–Isles*, 409 N.W.2d 536, 539 (Minn.App.1987) [As to Minnesota Statutes Section 325F.69, Subdivision 1].

We recognize that the causes of action authorized by the Minnesota Statutes may, in some critical respects, be broader than those allowed at common law, but the statutory remedies do not impose strict liability. *LeSage v. Norwest Calhoun–Isles*, supra at 539, citing *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 728 (Minn. 1983). We also expressly note that the Plaintiffs do not seek equitable relief under Section 325F.69, but seek damages pursuant to Minnesota Statutes Section 8.31, Subdivision 3a. Accordingly, the Plaintiffs will bear the burden of proving the proper legal nexus between the acts of which they complain and their alleged monetary losses. *Id.* (genuine issue of material fact as to whether plaintiffs knowledge of the defendants' assertedly deceptive practices under Section 325F.69); *Specialized Tours, Inc. v. Hagen*, supra at 536 (absence of reliance, on a purported misrepresentation of fact, precluded a recovery under Section 80A.01).

(D.Minn.1982), citing *Pfizer, Inc. v. International Rectified Corp.*, 538 F.2d 180, 185 (8th Cir.1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977).

Rather, we place our principal reliance upon the genuine factual issue presented by the Defendants' contention that, having had nearly a year to examine the Bank's accounts and to inquire with the pertinent State and Federal regulatory authorities, the Plaintiffs did not rely upon any representations of the Defendants. Admittedly, whether the Plaintiff's access to the Bank's books, or to the investigative findings of the regulators, was sufficient to reveal the purportedly deceptive aspects of the actions of which the Plaintiffs now complain is, quintessentially, a Jury issue. Not surprisingly, the Defendants make much of the fact that certain of the Plaintiffs were specialists in accounting and have held themselves out as holding banking expertise, well prior to the Plaintiffs' purchase of the Bank.[17] We are unable to ascertain, as a matter of law, what level of scrutiny was either applied by the Plaintiffs, or should have been applied by them, in evaluating the investment risks which were attendant to the purchase of a Bank that was known to be subject to significant, continuing restrictions upon its capacity to freely engage in the banking field.

In the final analysis, the relative knowledge and experience of the parties bears upon the reasonableness of the Plaintiffs' reliance. *Rochester Methodist Hosp. v. Travelers Ins. Co.*, supra, citing *Clements Auto Co. v. Service Bureau Corp.*, 444 F.2d

169, 183 (8th Cir.1971) and *Midland National Bank v. Perranoski*, 299 N.W.2d 404, 412 (Minn.1980). We cannot overlook the fact that two of the Plaintiffs functioned in a management capacity on the Bank's Board of Directors for a period of months before the purchase of the Bank was effectuated, that many of the loan transactions, which the Plaintiffs regard as deceptive, were expressly denoted as requiring special consideration in the parties' closing documents, and that the consummation of the purchase was delayed by the necessity of securing the approval of the sale by the State and Federal regulators. In our considered judgment, the presence of genuine issues of material fact preclude a summary resolution of the Plaintiffs' fraud claims.[18]

■ 2. *The Plaintiffs' Breach of Contract Claims.* In two variations on a common theme, the Plaintiffs argue that, generally, the Defendants breached the terms of their Purchase Agreement by failing to maintain the Bank's accounts in accordance with "generally accepted practices" and that, specifically, the Defendants departed from generally accepted accounting practices, at least in one instance, by misallocating the Bank's expenses for July of 1988. This purported misallocation could have critical importance since, according to the Plaintiffs' assertion, the purchase price of the Bank was overly inflated as a result of these asserted misallocations.

Despite the Plaintiffs' assurances that "no genuine issue of material fact" exists as to their breach of contract claims, we disagree.

---

**17.** While not dispositive, we find the Court's reasoning in *Specialized Tours, Inc. v. Hagen*, supra, to be instructive. There, the Court noted that the purchasers of a business had their own accountant review the business' books prior to the sale, and observed as follows:

The material information—the accounting method—was not only discoverable, but it was available to [the purchaser's] own accountant before the closing. Thus, we hold that under the circumstances of this case, the trial court erred in holding the net worth in the balance sheets violated Minn.Stat. § 80A.01(b). In doing so we caution that our holding is limited to the facts of this case, particularly respondent's knowledge of the accounting system used and its nonreliance on generally accepted accounting principles.

*Id.* at 536.

We recognize, as did the Court in *Hagen*, that a "failure to disclose that a financial statement was not prepared according to generally accepted accounting principles might afford the basis of a breach of warranty or securities law violation claim." *Id.* Here, however, we cannot conclude, as a matter of law, that the Plaintiffs were justified in their reliance upon the Defendants' representations which are presently at issue, for that remains a question of fact.

**18.** We have limited our discussion to the element of justifiable reliance, and we do not mean to suggest, nor should one infer, that the other elements of a fraud claim have been satisfied, as a matter of law, in the Plaintiffs' favor.

First, the parties offer no definition of the meaning of "generally accepted accounting practices" and the term does not purport to have an immutable definition. While offering the opinion of Mr. Daniel R. Cartier that certain of the Defendants' bookkeeping practices were "improper" or "imprudent," the Court has not be presented with an incontrovertible basis to conclude that any of the entries, which the Plaintiffs have questioned, breach the standard of "generally accepted accounting practices." Moreover, given the focal significance of the monthly entries for July of 1988, we are not surprised that the parties expressly provided a means of adjusting those monthly entries so as to reflect the true book value of the Bank.

In this respect, the parties agreed to accept the adjustments made by the Defendants' accountant, Al Skur. Notably, the Plaintiffs do not suggest—let alone make a compelling demonstration—that the month-end adjustments of Mr. Skur had not received the acquiescence of the Plaintiffs. On this record, we are satisfied that the accountants from both sides of the transaction reviewed the financial statements and books of the Bank for the period ending on July 31, 1988, and all were apprised of the critical role those statements could have on the purchase price of the Bank. Given their intensely fact-dependent nature, these breach of contract issues require a Jury's consideration unless, at some stage of the proceedings, one party or the other demonstrates that the issues are solely governed by a legal construction. Such a demonstration has not currently been made.

■ 3. *The Defendants' First Counterclaim.* In their First Counterclaim, the Jubies allege as follows:

That under the separate agreement of purchase of said bank, certain other arrangements were made for the health care of Defendants Jerry Jubie and Irene Jubie. That Plaintiffs and each of them failed to abide by these separate agreements, depriving Defendants Jerry and Irene Jubie of the opportunity to purchase and retain health benefits to their damage. That because of the health situation of Jerry Jubie, the Plaintiffs knew they placed him in an untenable situation where he cannot purchase new health insurance, and is deprived of the protection of said policies.

This claim finds its origin in the language of the Amendment to Retirement Agreement, dated August 9, 1988, which provided as follows:

That Jerry Jubie shall receive, in addition to the monthly retirement payments, the continuance of his Life & Health Group Policy but that the expense of such policy shall be paid by Jubie and Jubie shall reimburse the Bank on a monthly basis for the premium of said policy. If the Bank shall not receive the policy premium by the 8th of the month when due, the Bank shall have the option of cancelling said policy and coverage without any further notice to Jubie.

In a separate agreement, also dated August 9, 1988, the parties agreed, in pertinent part, as follows:

4. Sellers [i.e., the Jubies] shall reimburse the First State Bank of Floodwood for all premiums paid on Sellers' behalf for hospitalization and medical coverage. This payment shall be made monthly and in advance. If payment is not received from Sellers by the 8th day of the month, it is agreed that the Bank may, at its option, immediately cancel Sellers' hospitalization and medical insurance.

5. The Bank shall, upon receipt of any monies on this claim [i.e., the claims against the Olness and Raimey accounts], either credit Sellers bank account or forward same to Sellers, as the Sellers may direct from time to time, provided, however, if Sellers are delinquent on hospitalization and medical premiums or Sellers owe any payment on any of the guaranteed loans under the Agreement of October 9, 1988 and the Addendum thereto, then Bank may off-set said amounts owed against said claims. There shall be no right of off-set unless Sellers are delinquent on said premiums or guarantees.

Apparently, the terms of these agreements were subsequently modified as reflected in Lindberg's letter to Jubie of March 2, 1990:

In the agreement, it was stated that if the bank did not receive the policy premium by the 8th of the month, the bank can cancel the policy and coverage without any notice to you. This agreement was modified by you and myself in a letter to you of August 3rd indicating that it was necessary to have your payments into the bank by the 15th of each month. You have done this each month except for October when it was paid on the 17th and January when it was paid on the 16th.

Last month I sent the insurance billing to you on February 8th and today, March 2nd, I received your remittance for $397.69. Since your remittance was not at this bank by the designated date we are returning your check to you.

The parties have provided us with no other indicia of their contractual intent than is contained in the foregoing documentary evidence.

While not free from doubt, the parties appear to have agreed that the Bank would function as something more than a mere conduit for the payment of the Jubies' insurance premiums. By accepting the provision which authorizes the Bank to off-set any delinquency in the Jubies' insurance premium payment, the parties may well have been recognizing an obligation on the Bank's part to assure that the Jubies' insurance coverage would not lapse so long as the Bank was in possession of funds, arising from a collection on the Olness and Raimey claims, which could be applied to the amount of the insurance premium.[19] We do not suggest that this is the *only* reasonable construction of the contract language at issue but, rather, it is *a* construction that the Jury could reasonably infer. *Maurice Sunderland Architecture v. Melvin Simon*, 5 F.3d 334, 337 (8th Cir.1993); *City of Virginia v. Northland Of-*

*fice Properties Ltd. Partnership*, 465 N.W.2d 424, 427 (Minn.App.1991) (If a contract is ambiguous, the meaning of the contract becomes a question of fact). Since the language of the contract at issue here is reasonably susceptible to more than one meaning, we find the contract to be ambiguous. *Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn. 1982).

We believe that, necessarily, it is a Jury question as to whether the Plaintiffs breached their agreement with the Defendants, that allowed the Plaintiffs to offset any funds owing to the Defendant on the Olness and Raimey accounts, by the amount, if any, to which the Defendants were delinquent on their "hospitalization and medical premiums." We recognize that the language in question suggests a permissive and not a mandatory tone, but we also recognize that, during the period in which the Plaintiffs effectively cancelled the Defendants' insurance coverage, they were holding nearly $4,000 in funds from the Olness Trustee in Bankruptcy which, we understand, were owing to the Defendants. On this record, we are unable to conclude, as a matter of law, that the Plaintiffs could unilaterally escrow those funds while, at the same time, they could terminate the Defendants' health insurance coverage for a purported delinquency. The evidence at trial may well lead to that conclusion, but the language at issue is sufficiently vague as to preclude the award of Summary Judgment at this stage.

■ Our determination in this respect is not altered by the Plaintiff's argument that the Defendants settlement of their wrongful termination of coverage dispute, with the Bank's health insurance carrier and underwriting agent, constitutes an insuperable bar to the Defendants' First Counterclaim.[20] We

---

**19.** In particular, we note Lindberg's statement to Jubie, in his letter of March 2, 1988, that there was no amount left over from the Jubies' Retirement Agreement payment to apply to their life and health group policy. We find no uncontroverted basis in this record to conclude that the Jubies' life and health policy "payment" had to made in the exact amount of the premium due. On the state of the record before us, a Jury might reasonably conclude, as is intimated by Lindberg, that the payment of the health insurance

premium could be drawn from other funds that the Bank held for the Jubies' benefit.

**20.** Whether we treat the Plaintiffs' effort at claim or issue preclusion to be premised upon the doctrine of *res judicata* or upon collateral estoppel, it is clearly without merit. Even if liberally construed as an attempt at collateral estoppel, which is far more facilely applied than the doctrine of *res judicata*, the Plaintiffs' attempt must fail.

have closely reviewed the pleadings that the Plaintiffs have submitted in a case entitled *Jerry J. Jubie v. John Hancock Mutual Life Insurance Company; The Prudential Insurance Company of America; and Thomas Northey, Individually and Doing Business as William P. Northey Company*, Court File No. C3–92–600204, which was venued in the State District Court for the Sixth Judicial District of the State of Minnesota, and we are unable to reasonably infer any identity in the parties or the issues in that proceeding with those presently before this Court. The fact that Jubie may have commenced and settled a claim against other parties for a termination of his health insurance policy effective in December of 1989—fully three months before the cancellation at issue here—and under statutory laws that are inapposite to his current claim, is not even arguably preclusive to the issue raised in his First Counterclaim.[21] To the extent that the Plaintiffs may be arguing that the Defendants were made whole by their settlement of the State Court claim, we find no evidence to support any such surmise. If, in fact, there is but one claim of damage which is identical in both the State and Federal proceedings, and should the Plaintiffs be found liable on the Defendants' First Counterclaim, then the Plaintiffs may well be entitled to an offset in the amount of the State Court settlement, but we are unable to make that judgment, given the ·sparsity of the record that is presently before us.

Accordingly, we conclude that the Plaintiffs are not entitled to Judgment, as a matter of law, on the Defendants' First Counterclaim.

4. *The Defendants' Second Counterclaim.* For their Second Counterclaim, the Defendants allege as follows:

> Plaintiffs falsely and fraudulently turned into the Federal Bureau of Investigation several reports relative to fraud committed by Timothy Jubie and Jerry J. Jubie, thus vilifying their good name and reputation, and forever foreclosing them of the right to enter into any banking positions in their future, because said false allegations were in the FBI files, thus depriving them of an opportunity to earn a living.

In response, the Defendants underscore that, in reporting the Jubies' activities to the FBI, they were doing no more than honoring their legal obligations under the governing laws and, therefore, their statements were "conditionally privileged," even if they were false. See, *Title 12 C.F.R. § 353.1.* We agree, although we find the privilege to be absolute and not merely conditional.[22]

In so concluding, we recognize that this precise issue has not been definitively addressed by the Minnesota Supreme Court but, notwithstanding that fact, the Court has clearly delineated its most probable ruling were it called upon to resolve the matter. On repeated occasions, the Minnesota Courts have accepted the fundamental precepts of the Restatement (Second) of Torts § 592A (1977), that:

> One who is required by law to publish defamatory matter is absolutely privileged to publish it.

*Id.*; see, *Johnson v. Dirkswager*, 315 N.W.2d 223 (Minn.1982) (citing and quoting Section

---

Minnesota Courts follow the general rules of collateral estoppel that are almost universally applicable. *Glass v. IDS Financial Services, Inc.*, 798 F.Supp. 1411, 1415 (D.Minn.1992). Under Minnesota law, the party that is invoking collateral estoppel must demonstrate:

(1) the issue was identical to one in a prior adjudication;
(2) there was a final judgment on the merits;
(3) the estopped party was a party or in privity with a party to the prior adjudication; and
(4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Mandich v. Watters*, 970 F.2d 462, 465 (8th Cir. 1992), quoting *Kaiser v. Northern States Power Co.*, 353 N.W.2d 899, 902 (Minn.1984).

We find no basis in law or fact upon which to conclude that the issues raised in the State Court action were identical to those the Defendants seek to litigate in their First Counterclaim.

**21.** In the same sense, and for the same reason, we are unable to conclude that the decision of the State Court in *First State Bank of Floodwood v. BancInsure, Inc.*, Court File No. C5–92–600964, 1994 WL 102023, (1994) has any collateral estoppel or *res judicata* impact on the present proceedings.

**22.** Given our holding here, we need not address the Plaintiffs' fact-laden contention that their statements to the FBI were true.

592A with approval); *McDevitt v. Tilson,* 453 N.W.2d 53, 56 (Minn.Ct.App.1990) ("It is clear that one who is required by law to publish allegedly defamatory statements is absolutely immune for his acts."); *Freier v. Independent School District No. 197,* 356 N.W.2d 724, 729 (Minn.Ct.App.1984) (Court expressly acknowledges that the absolute privilege codified by Section 592A is "well established.").

Although we recognize that the Minnesota Courts have only adopted the principle of Section 592A in the context of a public body which is obligated, by the operation of law, to republish a defamatory statement, we see no compelling reason to distinguish the obligations of a public body from those of any other law-abiding citizen.[23]

Here, Title 12 C.F.R. § 353.1(a) required the Bank to report "apparent violations" of the banking laws to the FBI whenever those suspected criminal violations might affect the assets of the Bank. The Section defines "apparent violations" as follows:

> For purposes of this part, the phrase *apparent violation* implies that there is a reasonable basis for believing that a crime has occurred, is occurring, or may occur.

*Id.,* [Emphasis in original].

Given the less than exacting standard which precipitates the reporting requirements of Section 353.1(a), and in view of the absence of any assertion that a publication of the purportedly defamatory materials occurred outside of the scope of that Section, we believe that the contents of the Plaintiffs' report to the FBI was absolutely privileged. Any other construction of Section 353.1(a) would impermissibly place those, such as the Plaintiffs, in an entirely untenable posture of either failing to report a suspected crime, which would potentiate to the imposition of penalties,[24] or of reporting the suspected offense at the peril of being exposed to claims of defamation, with a consequential exposure to damage claims and litigation costs. Given our finding of an absolute privilege, citizens need not report suspected criminal offenses at their personal financial peril, and the effective enforcement of the nation's banking laws will be promoted.[25]

Therefore, we find that the Plaintiffs are entitled to Summary Judgment as to the cause of action alleged in the Defendants' Second Counterclaim.

■ *5. The Defendants' Third Counterclaim.* For their Third Counterclaim, the Defendants have generally alleged as follows:

> That by falsely and incorrectly and illegally retaining the monthly retirement agreement funds from the defendants, Jerry J. Jubie and Irene M. Jubie, Defendants and each of them effectively have been placed in such a position that they could not fulfill any business or any other kind of financial responsibilities, thus depriving them of any

23. Although premised somewhat differently, the Federal cases are not to the contrary. In *Slotten v. Hoffman,* 999 F.2d 333, 335 (8th Cir.1993), the Court commented as follows:

> The federal government and its agents often rely on private parties for information necessary to execute governmental functions. When private parties are under a mandatory duty to supply such information, they are entitled to the government's official immunity. *Becker v. Philco Corp.,* 372 F.2d 771, 773–74 (4th Cir.), cert. denied, 389 U.S. 979, 88 S.Ct. 408, 19 L.Ed.2d 473 (1967) (Philco held immune from suits resulting from its reporting suspected security breaches to the government).

See also, *Bushman v. Seiler,* 755 F.2d 653 (8th Cir.1985); *Gulati v. Zuckerman,* 723 F.Supp. 353, 358 (E.D.Pa.1989); *Blum v. Campbell,* 355 F.Supp. 1220, 1224 (D.Md.1972).

24. We note in *United States v. LBS Bank—New York, Inc.,* 757 F.Supp. 496, 500 n. 5 (E.D.Pa. 1990), that a purported violation of the reporting requirements of Section 353.1(a) served as a basis of a criminal charge. We also note that the language of the section creates a mandatory reporting obligation on the part of insured nonmember banks and that, in fulfilling that obligation, the Bank consulted with its legal counsel, who completed the requisite reporting forms.

25. Title 12 C.F.R. § 353.0 expresses the intent of the reporting requirements as follows:

> The purpose of this part is to reduce losses to insured nonmember banks resulting from criminal violations of the United States Code involving or affecting the assets or affairs of such banks through the requirement of prompt and systematic reports by such banks of such crimes or attempted crimes.

Accordingly, we conclude that our holding here is inconsistent with and effectuates the purpose of the regulations at issue.

way to maintain their way of living and their livelihood.

The Defendants have asserted that they are not liable for any damages that are being sought in this Counterclaim since the Retirement Agreement was void as being without consideration, because the Defendants had breached the parties' Purchase Agreement, because the Retirement agreement was against public policy, and because any payments to the Defendants, under the terms and conditions of the Retirement Agreement, were validly withheld as offsets to other sums that the Defendants owed to the Plaintiffs. We find none of these arguments persuasive.

First, we note that, in renegotiating the Retirement Agreement, the parties modified its terms so as to cause the final two years' of retirement payments to be forfeited if, during the two year period following the closing of the Bank's sale, "the annual average outstanding balance of retail installment sales contracts acquired from Schneiderman's Furniture is less than 90 percent of the balance of said contracts at the date of closing." Tying the continuance of pension payments to the continuance of a productive line of credit with a local commercial outlet belies any contention that the Bank's agreement to provide for Jubie's retirement was a gratuitous act. Moreover, on this record, the extent to which the Board's express approval of the Retirement Agreement, as reflected in the signatures of the Board members, was contingent upon any confirmatory approval by a State or Federal agency remains a controverted issue.[26]

Second, as we have already related, whether the Defendants did, in fact, breach any of the terms of the Purchase Agreement remains an issue of fact for a Jury's determination. Accordingly, we may not presume that such a breach will excuse the Plaintiffs' performance of their obligations, if any, under the Retirement Agreement.

Third, we find the Plaintiffs' argument on public policy grounds to be somewhat disingenuous. The Jubies' Retirement Agreement was not a hidden, side-bar arrangement that successfully avoided the attention of the parties in the negotiations which effectuated the sale of the Bank. In many respects, the Retirement Agreement was an available means to make the Bank's sale palatable to both sides. To suggest, at this late date, that the Retirement Agreement was renegotiated, with an awareness by at least one of the participants that the Agreement was in violation of public policy, does not speak well of that parties' intentions. If knowledge of the illegality of the Agreement occurred after its negotiation, a different set of considerations do come into play but, in the final analysis, those considerations are also fact-dependent. On this record, a Summary Judgment would be entirely inappropriate.

Lastly, we recognize that the Retirement Agreement held the potentiality of insuring payments on a class of loans which were of sufficient concern so as to result in their explicit identification in the closing documents. We are unable to determine, on the basis of the contested record before us, that payments which were owed to the Defendants, under the terms of the Retirement Agreement, were appropriately treated as off-sets in view of the accord of the parties that the Bank would exhaust "all judicial proceedings and reasonable collection efforts against the debtors on each of the [referenced] loans" prior to pursuing their legal remedies against the Defendants. We have no means of ascertaining, on the strength of this sparse record, if all reasonable efforts on the part of the Plaintiffs had been appropriately exhausted.

Therefore, the Motion for Summary Judgment on this claim is also denied.

NOW, THEREFORE, It is—

ORDERED:

1. That the Plaintiffs' Motion for the entry of Summary Judgment in their favor on the Defendants' Second Counterclaim is GRANTED.

---

26. We further note that the sale of the Bank, which was replete with references to the Retirement Agreement, was approved by the relevant State and Federal regulators. On this record, we are not aware of what other approvals, if any, were outstanding.

2. That the remainder of the Plaintiffs' Summary Judgment Motions are DENIED.

3. That the Plaintiffs' Motion for reasonable costs and attorneys fees, as would be permitted by Minnesota Statutes Sections 325F.68 through .70 and Section 8.31, is DENIED.